**Cecil McLENDON, Don Vandertulip, Jimmie Cartharn, and Konrad Trojniar, on their own and on behalf of all others similarly situated, Plaintiffs,**

v.

**The CONTINENTAL GROUP, INC., a New York corporation incorporated in 1913; Continental Can Company, Inc., a Delaware corporation; the Continental Group, Inc., a New York corporation incorporated in 1982; and KMI Continental Inc., a New York corporation, Defendants.**

Civ. A. No. 83–1340.

United States District Court,
D. New Jersey.

May 28, 1987.

Edwin C. Thomas, III, Dennis P.W. Johnson, Bell, Boyd & Lloyd, Chicago, Ill., Samuel W. Braver, Buchanan Ingersoll, P.C., Pittsburgh, Pa., Terrence Dwyer, Williams, Caliri, Miller & Otley, Wayne, N.J., Eugene L. Stewart, Stewart & Stewart, Washington, D.C., for defendants.

Stuart Israel, Miller, Cohen, Martens, & Ice, Southfield, Mich., Howard S. Simonoff, Tomar, Park, Seliger, Simonoff, Adourian & O'Brien, Haddonfield, N.J., for third party defendants.

Robert Plotkin, John G. Jacobs, Plotkin & Jacobs, Ltd., Chicago, Ill., George F. Galland, Davis, Barnhill & Galland, Chicago, Ill., Donald J. Volkert, Siff, Newman, Rosen & Parker, Newark, N.J., Daniel P. McIntyre, Falmouth, Me., for plaintiffs.

## OPINION

SAROKIN, District Judge.

In *Gavalik v. Continental Can Co.*, an action brought against Continental by for-

mer employees of its Pittsburgh plant, the Third Circuit held that Continental's adoption of a corporate "liability avoidance" program to reduce its unfunded pension exposure constituted a violation of ERISA. Plaintiffs in this action, on behalf of a nationwide class of former Continental employees, challenge the same program.

Before the court is plaintiffs' motion for partial summary judgment as to liability on their ERISA claims. Because the findings adopted by the Third Circuit in *Gavalik* preclude Continental from relitigating the issues that establish its ERISA liability, the court grants plaintiffs' motion.

## I. BACKGROUND [1]

In 1977, Continental and USW negotiated a collective bargaining agreement which made available two types of "Magic Number" pension benefits to employees who have been laid off for two years or who have been laid off as the result of a plant closing. An employee becomes eligible for "Rule of 65" benefits if he has twenty years of continuous service with Continental and if, at any time within two years of his last day worked, the employee's age and years of service total at least sixty-five years. Under the "Rule of 70/75" pension, an employee with fifteen years of continuous service could qualify if he either (a) was at least fifty years of age and had combined age and service totalling at least seventy years or (b) had combined age and service totalling at least seventy-five years. Such Magic Number benefits were not supported by a pension fund, but were payable out of ordinary revenues.

Continental experienced a sharp and steady decline in business during the mid-1970's. Plaintiffs present internal documents revealing that, in light of this decline, Continental considered potential unfunded liability for Magic Number pensions to be a serious problem. Continental responded by devising a "liability avoidance program" to control and reduce such costs. The program had two goals—to lay off employees who had not yet become eligible for pensions and to retain employees whose benefits had vested previously.

To achieve these objectives, Continental adopted a "cap and shrink" program, whereby employment at a plant was capped at a maximum number and then allowed to shrink through attrition. Continental, in deciding whether to cap a particular plant, examined various economic factors including potential pension liability. Continental determined an actual cap level by assessing the needed level of production to meet projected sales. The cap level limited employment to a specific name on the roster and was effective for five years. Continental designated as "permanently laid off" all employees below the cap-line, whether then at work or on temporary layoff. Such employees could not be recalled for five years, except under extraordinary circumstances. Furthermore, Continental instituted a "Red Flag" computer system to alert management whenever a permanently laid off employee inadvertently received a pay check.

Once the cap was in place, Continental tailored its business volume to meet the capped level of employment. Through the use of a computer tracking system, Continental authorized local plant managers to transfer business to plants with either low unfunded pension liability or plants that needed work to retain employees with vested Magic Number benefits.

The *Gavalik* litigation, instituted in 1981 in the U.S. District Court for the Western District of Pennsylvania, involved a challenge to the liability avoidance program by former employees of Continental's Pittsburgh plant who had been permanently laid off.[2] The *Gavalik* plaintiffs alleged that the institution and implementation of the

---

1. The court's recitation of facts borrows from *Gavalik v. Continental Can Co.*, 812 F.2d 834, 838–41 (3d Cir.1987), the case upon which plaintiffs' collateral estoppel claim is predicated. For an additional statement of background facts, see *McLendon v. Continental Group, Inc.*, 602 F.Supp. 1492, 1497–98 (D.N.J.1985).

2. *Gavalik v. Continental Can Co.* was filed on September 18, 1981. After *Gavalik* discovery revealed the extent of the liability avoidance program, *Jakub v. Continental Can Co.* was filed on September 27, 1982. The cases were consolidated and a single class action was certified.

program prevented their attainment of benefits in violation of § 510 of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1140. On September 24, 1985, after a bench trial solely on the issue of Continental's ERISA liability, the district court ruled in Continental's favor. The court found that Continental adopted the liability avoidance program, implemented it at Pittsburgh, and that a "motivating factor" behind that decision was a desire to prevent employees from attaining eligibility for Magic Number benefits. *Gavalik v. Continental Can Co.*, Nos. 81–1519 and 82–1995, slip op. at 9–12, 17–19, 21 (W.D.Pa. Sept. 24, 1985) (Findings of Fact 51–70, 109–22, 141). The court concluded, though, that such conduct did not violate § 510 of ERISA. *Id.* at 21.

The Third Circuit reversed, finding that Continental's "maintenance of the [liability avoidance] program with the specific intent to interfere with class members' pension eligibility was in itself a classwide violation of ERISA entitling [plaintiffs] to injunctive relief." *Gavalik v. Continental Can Co.*, 812 F.2d 834, 857 (3d Cir.1987). The court also held that Continental committed independent classwide violations by capping the Pittsburgh plant, by designating Pittsburgh employees as permanently laid off, and by instituting the red flag system in Pittsburgh. *Id.* at 862.

On April 15, 1983, the named plaintiffs, former employees of Continental plants in Passaic, New Jersey and Chicago, Illinois, filed this action against Continental. Plaintiffs allege that Continental's liability avoidance program violates § 510 of ERISA, as well as the Racketeer Influenced and Corrupt Organizations Act (RICO). On January 8, 1987, this court certified a class consisting of

> all past or present members of the Continental Pension Plan who suffered a break in pension service subsequent to December 1, 1977, or who shall hereafter suffer a break in pension service, as a result, in whole or in part, of Continental's alleged Capping Program....[3]

**3.** The class excludes employees of Continental plants in Pittsburgh, Los Angeles, and Fairfield,

Plaintiffs move for partial summary judgment as to liability on their ERISA claims.

## II. DISCUSSION

*Gavalik v. Continental Can Co.*, 812 F.2d 834 (3d Cir.1987) directs this court's determination of plaintiffs' motion. First, *Gavalik*, as Third Circuit precedent binding on this district, sets forth the legal requirements for establishing liability on a § 510 class action claim. Second, *Gavalik*, as an action involving claims "virtually identical" to those in this action, *see id.* at 847 n. 27, precludes Continental from relitigating factual issues that establish its liability under § 510.

### A. Gavalik *as legal precedent—Class action liability under § 510*

#### 1. *Structure of § 510 class action litigation*

*Gavalik* applies to § 510 class action litigation the methodology developed by the Supreme Court for structuring Title VII employment discrimination class actions. This methodology contemplates a two-phase trial: during the initial "liability" phase, the focus is on whether defendant has engaged in a pattern or practice of discrimination justifying an award of prospective injunctive relief to the class; during the second "remedial" phase, the focus is on the consequences of this discrimination and the entitlement to relief of individual class members. *See Cooper v. Federal Reserve Bank*, 467 U.S. 867, 875–76, 104 S.Ct. 2794, 2799, 81 L.Ed.2d 718 (1984); *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 360–362, 97 S.Ct. 1843, 1867–68, 52 L.Ed.2d 396 (1977). Plaintiffs seek summary judgment on the liability phase of their § 510 claim.

#### 2. *Elements of liability under § 510*

Section 510 provides in relevant part:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a partici-

Alabama. These plants were the subjects of separate actions.

pant or beneficiary ... of an employee benefit plan ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan.

■ This court understands *Gavalik* to require class action plaintiffs to prove three elements in order to prevail at the liability stage of a § 510 action—employer conduct, discriminatory intent, and causation.

■ *Employer conduct.* Section 510 prohibits discrimination against participants in benefit plans. In a class action context, plaintiffs must prove more than isolated acts of discrimination by an employer—the class representative must establish that discrimination was the employer's "standard operating procedure." *See International Bhd. of Teamsters*, 431 U.S. at 336, 97 S.Ct. at 1855; *Gavalik*, 812 F.2d at 852.

■ *Discriminatory intent.* Proof of specific intent to interfere with the attainment of pension eligibility is the essential element of a § 510 claim. *See Gavalik*, 812 F.2d at 851. As in other employment discrimination contexts, plaintiffs may prove discriminatory intent either circumstantially or directly. Circumstantial evidence is analyzed using the burden-shifting mechanism set forth in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253–54, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). See *Gavalik*, at 852–53. Where direct evidence of discriminatory intent exists, problems of proof are no different than in other civil cases. *See Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893 (3d Cir.1987) (en banc); *Gavalik*, 812 F.2d at 853.

■ *Causation.* Proof of "causation" is a prerequisite to a finding of liability for a § 510 class violation. *Gavalik*, 812 F.2d at 860. Plaintiffs must show some nexus between the challenged conduct and the discriminatory intent. That requirement is satisfied, however, by "proof that the desire to defeat pension eligibility is 'a determinative factor' in the challenged conduct." *Id.*

Proof of these three elements establishes a defendant's liability for a classwide violation of § 510 and entitles plaintiffs to prospective injunctive relief. *See Gavalik*, 812 F.2d at 857 (*citing International Bhd. of Teamsters*, 431 U.S. at 360–61, 97 S.Ct. at 1867; *Cooper*, 467 U.S. at 876, 104 S.Ct. at 2799). The proceedings then move onto the remedial stage to determine whether specific class members are entitled to relief.

### 3. Application of § 510 to the liability avoidance program

Plaintiffs seek to satisfy these requirements by proving that Continental adopted the liability avoidance program as their corporate policy, and that Continental's intent to prevent employees from becoming eligible for Magic Number benefits was a determinative factor in this adoption. Continental's response—their primary defense to this motion—is that *Gavalik* requires that plaintiffs demonstrate that the capping program was actually implemented in specific locations and that it caused specific layoffs. Continental's argument in summary is as follows:

> To prevail on their motion for summary judgment, plaintiffs must show that, without question, an intent to deprive the class members of pension benefits in fact determined specific employment decisions at issue herein and did so regularly and routinely.

Memorandum in Opposition to Plaintiffs Motion for Partial Summary Judgment, at 18. Continental presents its basic argument in several guises.

#### a. Conduct

■ Continental's principal contention is that plaintiffs must show "specific employment decisions"—actual layoffs—to meet the conduct requirement of § 510. *Gavalik*, however, rejects Continental's position.

Section 510's conduct requirement is satisfied by proof of "adoption" of the liability avoidance program. Adoption of the scheme itself, apart from actions taken in furtherance of the scheme, constitutes an independent § 510 violation. *See Gavalik*, 812 F.2d at 854; *see also id.* at 854 (explic-

itly rejecting Continental's position that "adoption of the plan, without more, cannot support a finding of liability"); *id.* at 855 n. 36 ("In a class action context, however, the 'scheme' or policy is exactly what is at issue."); *id* at 857 (concluding that "maintenance of the program with the specific intent to interfere with class members' pension eligibility was in itself a classwide violation of ERISA").

*Gavalik* interprets the conduct requirement of § 510 in light of the provision's objectives.

> Section 510, however, unlike other anti-discrimination provisions, is designed to *prevent* injury to employees' protected rights, not simply to redress the injury after the goals of a discriminatory plan have been effectuated. To be certain, the broad, remedial objectives of § 510 do not authorize sanctions merely for an employer's state of mind. There must be some act in furtherance of an employer's desire to interfere with an employer's state of mind. That act, however, need not achieve the employer's illicit goals. To keep the effects of discriminatory intent "in the air," so to speak, is part of § 510's *raison d'etre*. The statute prohibits specified conduct "for the purpose of interfering with the attainment of any right...." Thus, actual deprivation is not a prerequisite to class liability under § 510, *ergo* the challenged act need not have caused actual deprivation or have actually interfered with· the attainment of pension eligibility.

*Gavalik*, 812 F.2d 856.

█ Adoption of the liability avoidance plan at the corporate level qualifies as "some act[s] in furtherance" of Continental's discriminatory intent. Plaintiffs' claim does not rest on Continental's desire to prevent employees from attaining Magic

Number pension eligibility. Development of the capping scheme—creation of the Bell system, devising the tracking program and other details necessary for its operation—"constituted deliberate steps undertaken for the purpose of interfering with [plaintiffs'] attainment of pension eligibility." *Gavalik*, 812 F.2d at 856. Gavalik counsels that a § 510 violation may be predicated on "the inchoate components of the liability avoidance scheme that [produced] no immediate or tangible effects on [plaintiffs'] rights." *Id.* Gavalik repeatedly rejects Continental's position that plaintiffs, before prevailing at the liability phase, must prove that the capping program led to specific layoffs.[4]

At oral argument, Continental, pushing to one side the above cited sections of *Gavalik*, argued that its position is supported by the following passage from *Gavalik*'s conclusion:

> We emphasize our holding that Continental's liability avoidance scheme constituted a violation of ERISA when, pursuant to that scheme, individual class members—whether currently at work or already on layoff status—were designated as permanently laid off for the purpose of defeating pension eligibility. Upon such designation, each class member was entitled to some relief from the illegal scheme.

*Gavalik*, 812 F.2d at 865. Continental's argument—that this passage requires plaintiffs to demonstrate specific implementation of the capping program on a nationwide level before establishing stage I liability—is belied by the structure of the *Gavalik* opinion.

*Gavalik* explains that plaintiffs' allegations present several independent ERISA violations.

---

**4.** See *id.* at 851–52 ("Proof of specific intent to interfere with the attainment of pension eligibility, then, 'regardless of whether the interference is successful and regardless of whether the participant would have actually received the benefits absent the interference' will ordinarily constitute a violation of § 510 of ERISA.") (citation omitted); *id.* at 854 n. 34 (criticizing the district court for having "repeatedly thwarted" plaintiffs' attempt to challenge the capping program

on the whole by "requiring ... proof of an act that *actually* interfered with appellants' eligibility as opposed to one taken for the purpose to do so"); *id.* at 857 (stating that plaintiffs, by showing the maintenance of the capping program, had met the burden and were entitled to injunctive relief "wholly apart from the determination whether individual class members were actually laid off in accordance with the plan").

Each of the acts that appellants claim was undertaken for proscribed purposes may independently make out a claim of discrimination under § 510. We shall first consider the liability avoidance program. Because the question whether the individually challenged actions of Continental—the layoffs, the capping of the Pittsburgh plant, and the closure of the pail line—constitute violations of ERISA present similar procedural issues, those claims will be considered together in a separate section.

*Gavalik,* 812 F.2d at 854. The court first discusses the liability avoidance program, in and of itself, as a § 510 violation. Next, the court examines plaintiffs' "remaining claims," charging that "Continental took specific actions, pursuant to its intentionally discriminatory liability avoidance scheme that resulted in their loss of employment." *Gavalik,* 812 F.2d at 858. The court addresses whether the presumption arising from the discriminatory liability avoidance plan extends to certain "discrete acts" contemplated to implement the plan. *Id.* at 862. The court holds that "the designation of class members as permanently laid off" is one such act to which the presumption extends. *Id.*

The passage relied upon by Continental must be understood given the above context. The court's conclusion does not reiterate the analysis of independent § 510 violations contained in the body of the opinion. The conclusion first states that Continental's liability avoidance plan constituted a classwide violation of ERISA. *Gavalik,* 812 F.2d at 865. The passage quoted by Continental, referring to designation of employees as permanently laid off, reiterates the court's holding that such designation, as a specific action taken pursuant to the liability avoidance program, violated ERISA. The passage does not vitiate an entire section of the opinion concluding that adoption of the program as corporate

policy, in and of itself, constituted an independent ERISA violation.

This court concludes, based on its reading of *Gavalik,* that plaintiffs may demonstrate conduct sufficient to establish class action liability under § 510 by showing that the liability avoidance program was developed and adopted at the corporate level.[5] At the initial liability stage, plaintiffs need not show that specific employees were designated as permanently laid off.

### b. *Causation*

At argument, Continental stressed *Gavalik*'s holding that causation, properly construed, is a prerequisite to a finding of § 510 class action liability. *Gavalik,* 812 F.2d at 860. Continental's position, however, that *Gavalik* requires plaintiffs to show that the capping program caused specific individuals to be laid off, misconstrues the Third Circuit's opinion.

*Gavalik* makes plain that the causal nexus required is that between the discriminatory intent and the challenged conduct. *Id.* at 860 ("§ 510 ... requires no more than proof that the desire to defeat pension eligibility is 'a determinative factor' in the challenged conduct."). Thus, at the initial liability stage, plaintiffs need only show that the discriminatory intent was a determinative factor in the development and adoption of the program. Continental's argument erroneously requires a causal nexus between the discriminatory intent and the harm to the individual class members. Continental's "causation" argument is a restatement of its position, rejected above, that plaintiffs may demonstrate "conduct" in violation of § 510 only by showing actual layoffs.

### c. *Presumption of individual discrimination*

Continental, in support of its contention that plaintiffs must prove specific layoffs in order to establish § 510 liability, points

---

5. Continental maintains that plaintiffs must show actual implementation in order to prove that a discriminatory "pattern or practice" existed. However, the "pattern or practice" element requires only that the challenged conduct be "repeated, routine, or of a generalized nature" as opposed to isolated and sporadic incidents.

*See International Bhd. of Teamsters v. United States,* 431 U.S. 324, 336 n. 16, 97 S.Ct. 1843, 1855 n. 16, 52 L.Ed.2d 396 (1977). The capping program involves conduct—setting capping levels and designating employees as permanently laid off—of a generalized nature.

to the following passage in *Gavalik:* "The presumption that arises upon proof of a discriminatory policy attaches to all employer actions that may reasonably be considered as 'within the ambit' of that policy." *Gavalik*, 812 F.2d at 861. Continental argues that such language "require[s] an affirmative showing of a causal relationship between the challenged company policy and particular decisions affecting employment." Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment, at 59. The quoted passage, however, does not refer to any prerequisite for § 510 liability. The passage deals with the scope of the presumption of individual discrimination created upon demonstrating liability for adoption of the capping program. *Id.* at 860–61. This presumption attaches to all discrete actions "within the ambit" of the capping program.[6] The court rejects Continental's interpretation of this passage of *Gavalik*.

In summary, plaintiffs, in order to prevail on their motion for partial summary judgment as to § 510 liability, must establish the following elements: 1) that Continental developed and adopted a liability avoidance program at the corporate level; 2) that Continental acted with an intent to interfere with plaintiffs' attainment of eligibility for Magic Number pensions; 3) that the discriminatory intent was a determinative factor in Continental's development and adoption of the program. Plaintiffs, at this stage of the litigation, need not demonstrate that they suffered individual harm as a result of Continental's conduct.[7]

### B. *Collateral estoppel effect of Gavalik*

Plaintiffs seek to use "offensive" collateral estoppel to preclude Continental from relitigating certain adverse factual findings in the *Gavalik* litigation. Plaintiffs, to prevail on this motion, must prove that Continental is precluded as to two issues: 1) that Continental developed and adopted a nationwide liability avoidance program as corporate policy; 2) that a determinative factor in that action was Continental's intent to deprive plaintiffs of Magic Number pensions.

As a general matter, a party seeking to invoke collateral estoppel on a given issue must establish four elements: 1) that the issue upon which preclusion is sought is identical to an issue involved in the prior action; 2) that the issue had been actually litigated in the prior action; 3) that the issue had been determined by a valid and final judgment; 4) that the determination of the issue was essential to the prior judgment. *See Haize v. Hanover Ins. Co.*, 536 F.2d 576, 579 (3d Cir.1976) (adopting Restatement of Judgments § 68(1)); *In re McMillan*, 579 F.2d 289, 291–92 (3d Cir. 1978) (following *Haize* ); *see also Bower v. O'Hara*, 759 F.2d 1117, 1124–26 (3d Cir. 1985) (citing *Haize*, and adopting Restatement (Second) of Judgments § 27 (1980) as effectively identical to original § 68(1)); *A. Stucki Co. v. Schwam*, 634 F.Supp. 259, 262 (E.D.Pa.1986). Furthermore, the party against whom estoppel is sought must have been a party to the prior action and must have had a full and fair opportunity to litigate the issue in the prior action. *See, e.g., Scooper Dooper, Inc. v. Kraftco. Corp.*, 494 F.2d 840, 844 (3d Cir.1974); *Orchard v. Covelli*, 652 F.Supp. 1173, 1175 (W.D.Pa.1987); *Myers v. Daubert*, 633 F.Supp. 45, 47 (E.D.Pa.1986).[8]

A plaintiff seeking to employ offensive collateral estoppel—that is, to bind a de-

---

**6.** The presumption concerns plaintiffs' requirement for proving discriminatory intent with regard to specific actions taken to implement the program. Once plaintiffs prove that the adoption of the program itself was motivated by discriminatory intent, plaintiffs are entitled to a presumption that all actions "within the ambit" of the program were similarly motivated. Thus, on these facts, plaintiffs need not present independent evidence that, for example, designation

of individuals as permanently laid off was motivated by discriminatory intent.

**7.** This issue will be resolved during the second stage of the proceedings, in accordance with the procedures described in *Gavalik*, 812 F.2d at 866.

**8.** Continental was a party to *Gavalik*. Furthermore, Continental does not contend that it was denied an opportunity to fully and fairly litigate the relevant issues in *Gavalik*.

fendant to an adverse ruling from a prior case brought by a different plaintiff—encounters additional concerns. The court discusses first whether plaintiffs have met the requirements of basic collateral estoppel and second whether the use of offensive estoppel is appropriate in this case.

### 1. *Basic collateral estoppel*

#### a. *Identity of issues*

The facts upon which plaintiffs seek estoppel—that Continental adopted a nationwide liability avoidance program, and that Continental's discriminatory intent was a determinative factor in that action—were litigated and decided in *Gavalik*. [9] The district court made detailed findings of fact concerning the development and adoption of the liability avoidance program. See *Gavalik v. Continental Can Co.*, Nos. 81–1519 and 82–1995, slip op. at 9–12 (W.D.Pa. Sept. 24, 1985) (Findings of Fact, 51–70). The court also found that the program was intended, in part, to avoid future vesting of unfunded pension liabilities. *Id.* at 9, 12 (Findings of Fact, 53, 68). The Third Circuit made plain that these findings were sufficient to establish a § 510 violation for adoption of the capping program. *See Gavalik*, 812 F.2d at 856–57.

■ Thus, the court rejects Continental's argument that *Gavalik* concerned only implementation of the program in Pittsburgh, and contained no findings relevant to plaintiffs' claims in this matter. Although the Third Circuit discussed Continental's § 510 liability for specific actions taken in Pittsburgh, the court plainly adopted factual findings of the district court on the identical issues upon which plaintiffs seek preclusion.

#### b. *Necessary to judgment*

Continental argues that *Gavalik* could have been based solely on the findings concerning implementation of the capping program at Pittsburgh. Therefore, according to Continental, the findings regarding the larger plan are relevant, but not necessary to the judgment in *Gavalik*. Continental's argument misconstrues both the holding of *Gavalik* and the applicable estoppel doctrine.

First, the Third Circuit's findings and conclusions regarding adoption of the liability avoidance program form the basis for its rulings as to the specific implementation actions at Pittsburgh. The court first discussed the liability avoidance program, in and of itself, as a § 510 violation. *Gavalik*, 812 F.2d at 854–57. The court then examined whether "[a]ppellants' remaining claims," *id.* at 858, concerning implementation at Pittsburgh, could "reasonably be considered as within the ambit" of the capping program. *Id.* at 861. Thus, the Third Circuit's rulings are not independent alternative grounds; the conclusion that specific implementation actions at Pittsburgh violate § 510 is predicated upon these actions being within the ambit of the discriminatory liability avoidance program.

Second, even if the holdings are considered as alternative grounds, the Restatement, generally adopted by the Third Circuit, *see Bower v. O'Hara*, 759 F.2d 1117, 1124–26 (3d Cir.1985); *Haize v. Hanover Ins. Co.*, 536 F.2d 576, 579 (3d Cir.1976), states that alternative holdings on appeal are "necessary" to judgment and therefore preclusive. *Restatement (Second) of Judgments* § 27, comment O (1980). Other authority supports this position. *See In re Dalkon Shield Punitive Damages Litig.*, 613 F.Supp. 1112, 1117 (E.D.Va.1985); 18 C. Wright, A. Miller, E. Cooper, *Federal Practice and Procedure* § 4421, at 208 (1981 & Supp.1986).

#### c. *Finality of judgment*

Continental makes three arguments that the Gavalik decision is not "final" and thus cannot have collateral estoppel effect. Each of these arguments fail.

---

**9.** Continental does not argue that these claims were not "actually litigated" in *Gavalik*. Continental's position, as articulated at oral argument, is that the issues litigated were not identical to those the *McLendon* plaintiffs must prove or that the determination of these issues was not essential to *Gavalik*.

■ First, Continental claims that the fact that the Third Circuit reversed the district court somehow renders any judgment nonfinal. This argument is contrary to established law. The Third Circuit's decision, to the extent that it reverses the district court, is the operative "judgment" for preclusion purposes. *See 1B Moore's Federal Practice*, ¶ 0.416, at 513 (1984).

■ Second, contrary to Continental's position, the fact that Continental may appeal the Third Circuit's ruling to the Supreme Court does not render the judgment non-final. *See, e.g., SSIH Equipment S.A. v. United States Int'l Trade Comm'n*, 718 F.2d 365, 370 (Fed.Cir.1983); *Commercial Union Assurance Co. v. Pucci*, 523 F.Supp. 1310, 1318 (E.D.Pa.1981); 18 C. Wright, A. Miller, E. Cooper, *Federal Practice and Procedure* § 4433, at 308 (1980) (stating that the "established rule" in the federal courts is that a final judgment retains all of its preclusive effect pending appeal).

Continental's third argument is that the *Gavalik* judgment is nonfinal because the Third Circuit remanded the case for further proceedings regarding remedies. This argument requires a closer look at the Third Circuit's application of "finality" in the collateral estoppel context.

Section 13 of the *Restatement (Second) of Judgments* provides:

> For purposes of issue preclusion ..., 'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect.

This approach to finality, more flexible than that required in the area of claim preclusion, has been adopted by the Third Circuit. *See Dyndul v. Dyndul*, 620 F.2d 409, 412 (3d Cir.1980) (adopting a draft provision identical to § 13). Comments to § 13 explain the approach.

> In particular circumstances the wisest course is to regard the prior decision of the issue as final for the purpose of issue

preclusion without awaiting the end judgment. See Illustrations 1-3. Before doing so, the court should determine that the decision to be carried over was adequately deliberated and firm, even if not final in the sense of forming a basis for a judgment already entered. Thus preclusion should be refused if the decision is avowedly tentative. On the other hand, that the parties were fully heard, that the court supported its decision with a reasoned opinion, that the decision is subject to appeal or was in fact reviewed on appeal, are factors supporting the conclusion that the decision is final for the purpose of preclusion.

*Restatement (Second) of Judgments* § 13 comment g (1980).

The Restatement deals explicitly with whether a finding of liability in a bifurcated trial is sufficiently final to have collateral estoppel effect. Illustration 3 following § 13 suggests that such a finding is "final," even though ordinarily nonappealable. In this case, where the determination of liability has been reviewed on appeal, this court considers the findings "sufficiently firm to be accorded conclusive effect," under the Restatement standard.

This determination is in accord with the decisions of several courts under analogous circumstances. *See, e.g., Zdanok v. Glidden Co.*, 327 F.2d 944, 955 (2d Cir.) (stating that "in an appropriate case" a ruling on liability is sufficiently final to have preclusive effect), *cert. denied*, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964); *GAF Corp. v. Eastman Kodak Co.*, 519 F.Supp. 1203, 1217 & n. 8 (S.D.N.Y.1981) (finding sufficiently final a liability determination affirmed on appeal, despite a remand for damages); *cf. Gilldorn Savings Ass'n v. Commerce Savings Ass'n*, 804 F.2d 390, 393 (7th Cir.1986) (following the Restatement approach in finding sufficiently final a nonappealable denial of a motion to dismiss).[10]

---

10. *Polk v. Montgomery County*, 782 F.2d 1196, 1201 (4th Cir.1986), cited by Continental, is not to the contrary. In *Polk*, the court found nonfinal a liability determination, because of case-specific problems concerning class definition. *Id.* at 1201. Furthermore, the liability determination had not been reviewed on appeal—the appeal had been dismissed as premature. *See*

### 2. Offensive collateral estoppel

The Supreme Court has granted district courts "broad discretion" to determine when a plaintiff who has met the requisites for application of collateral estoppel may employ that doctrine offensively. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979). The Court, in an attempt to guide the exercise of that discretion, enunciated the following "general rule":

> [I]n cases where a plaintiff could easily have joined in the earlier action or where ... the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel.

*Id.* at 331, 99 S.Ct. at 652.

Continental argues that the court, in its discretion, should not employ offensive collateral estoppel because the *McLendon* plaintiffs could have "easily joined" in the *Gavalik* litigation. Continental premises their argument on the fact that plaintiffs' counsel were planning a nationwide class action in late 1982, before trial in *Gavalik*, and counsel elected to bring a separate action rather than intervening in *Gavalik*. [11]

▮ The court then must address the hypothetical question of whether the *McLendon* plaintiffs could easily have intervened [12] in *Gavalik* during the period between the fall of 1982 and April 15, 1983, the date of filing of the *McLendon* complaint in New Jersey. [13] As a general matter, the court finds it difficult to imagine that a nationwide class action of this scope and complexity could easily be joined with any pending action. With regard to *Gavalik* in particular, all involved parties would have had an interest in opposing the McLendon plaintiffs' intervention. Continental has fought staunchly around the country—in Pittsburgh, New Jersey, and Los Angeles—to avoid litigating on a nationwide basis their liability under the capping program. The *Gavalik* plaintiffs' interest in timely resolution of their claims would have been compromised severely by inclusion of the *McLendon* claims in their case. *Cf. GAF Corp. v. Eastman Kodak Co.*, 519 F.Supp. 1203, 1215 (E.D.N.Y.1981) (considering the greater complexity of the second case and "unwarranted prejudice to the original plaintiffs in finding that second plaintiffs were not "wait and see" litigants). Judge Bloch had considerably advanced the Pittsburgh litigation (when *McLendon* was filed, *Gavalik* discovery had ended and *Jakub* discovery would close in two months) and inclusion of the *McLendon* claims would have substantially delayed trial of the case. [14] Under these cir-

---

*id.* at 1201. Similarly, other cases finding judgments to be nonfinal involved prior judgments that had not been appealed. *See Avondale Shipyards, Inc. v. Insured Lloyds*, 786 F.2d 1265, 1269–72 (5th Cir.1986) (refusing to give preclusive effect to a nonappealable partial summary judgment order that did not determine liability, and acknowledging that appeal before final judgment is a key consideration); *Luben Indus. v. United States*, 707 F.2d 1037, 1039–40 (9th Cir.1983) (holding that a trial court did not abuse its discretion in denying preclusive effect to a interlocutory decision in a bifurcated trial that had not been appealed).

**11.** Plaintiffs argue that the relevant inquiry involves the knowledge and actions of plaintiffs themselves, not plaintiffs' counsel or the USW. The court assumes for the purposes of this motion, without deciding as a matter of law, that the knowledge and actions of counsel are attributable to plaintiffs.

**12.** Plaintiffs contend that permissive intervention, as a matter of law, cannot constitute "easy joinder" under *Parklane Hosiery*. The court,

without passing on this question, decides only that leave to intervene on the facts of this case would not have been easily obtained.

**13.** Continental suggests also that plaintiffs could have easily filed their national complaint in Pittsburgh during this period, rather than filing *Jakub,* a complaint "drafted so as to artificially restrict the class to Pittsburgh workers," in September 1982. See Letter dated May 7, 1987 of Terrence Dwyer, at 3. Continental then implies that Judge Bloch would have consolidated *Gavalik* and the hypothetical Pittsburgh *McLendon* complaint. This contention, then, is analogous to the "easy intervention" argument.

**14.** That Judge Bloch eventually permitted consolidation of *Jakub* with *Gavalik* does not suggest that he would have granted leave for the *McLendon* plaintiffs to intervene or that he would have consolidated a hypothetical Pittsburgh *McLendon* with *Gavalik*. *Jakub,* like *Gavalik,* involved only Pittsburgh plaintiffs and did not expand the litigation as inclusion of the nationwide class would certainly have done.

cumstances, the court believes that the McLendon plaintiffs could not easily have intervened in *Gavalik.*

Furthermore, this case does not implicate the policies behind the "easy joinder" limitation. The Supreme Court recognized that the use of offensive collateral estoppel could increase the total amount of litigation by creating "wait and see" plaintiffs who sat on the sidelines hoping for a favorable judgment. *See Parklane Hosiery Co,* 439 U.S. at 330, 99 S.Ct. at 651. Continental has produced no evidence that plaintiffs' actions were so motivated. *Cf. Collins v. Seaboard Coastline R.R. Co.,* 681 F.2d 1333, 1336 (11th Cir.1982) (stating that *Parklane Hosiery* requires a court to examine plaintiff's motivation, even if she could have joined); 18 C. Wright, A. Miller, E. Cooper, *Federal Practice and Procedure* § 4465, at 596–97 (1980) ("Preclusion may come to be denied only if it appears that the later plaintiff stayed out of the first action solely in hopes of a one-way option at preclusion."). Continental has demonstrated only that plaintiffs' counsel, as a matter of litigation strategy, elected to file *McLendon* as a separate class action in New Jersey. Such an election, if not motivated by a "wait and see" attitude, does not preclude the use of offensive collateral estoppel. *See Nations v. Sun Oil Co.,* 695 F.2d 933, 938 (5th Cir.1983) (stating that a plaintiff was not precluded from using of-

fensive estoppel because of an election to await development of its injuries, where no purposeful delay was shown), *cert. denied,* 464 U.S. 893, 104 S.Ct. 239, 78 L.Ed.2d 229 (1983); *Starker v. United States,* 602 F.2d 1341, 1349–50 (9th Cir.1979) (allowing the use of offensive estoppel where joinder was "technically possible," but plaintiffs were motivated by tactical concerns, not a "wait and see" attitude); *Restatement (Second) of Judgments* § 29 comment e (1980) (stating that "due recognition" should be given to plaintiffs "normally available option" of prosecuting their own claim "without the encumbrance of joining with others whose situation does not substantially coincide with [their] own").[15]

The court finds that plaintiffs failure to join the *Gavalik* litigation does not preclude their use of offensive collateral estoppel.[16] Continental makes no claim that the use of collateral estoppel is otherwise unfair to them. Therefore, the court, in the exercise of its discretion, concludes that plaintiffs may employ offensive collateral estoppel against Continental with respect to *Gavalik.*[17]

CONCLUSION

Because the Third Circuit's opinion in *Gavalik* precludes Continental from relitigating the issues that establish its liability under § 510, plaintiffs are entitled to judgment as a matter of law on their ERISA

---

15. *See also Restatement (Second) of Judgments* § 29 reporter's note to comment e (1980) ("A claimant who simply stayed out of a prior action between others, on the other hand, may ordinarily invoke the benefits of a judgment where the prior action otherwise fulfills the criteria for preclusion."). The *Parklane Hosiery* court cited with approval the tentative draft provision of the Restatement that eventually became § 29. 439 U.S. at 330 n. 13.

16. *Polk v. Montgomery County,* 782 F.2d 1196, 1202 (4th Cir.1986), cited by Continental, does not suggest a different result. In *Polk,* the plaintiff in the second case was a potential member of the plaintiff class in the first case, but chose to bring a separate action. Such a holding does not affect the court's exercise of its discretion on the different facts involving *Gavalik/McLendon.* Other cases cited by Continental establish only that, on facts dissimilar to those involved here, district courts did not abuse their discretion in refusing to permit the use of offensive

estoppel. *See Hauser v. Krupp Steel Prods.,* 761 F.2d 204, 207 (5th Cir.1985) (denying collateral estoppel to wife who did not join husband's earlier suit against a truck driver concerning the same accident upon which her suit was based); *Charles J. Arndt, Inc. v. City of Birmingham,* 748 F.2d 1486, 1494 (11th Cir.1984) (invoking the "wait and see" limitation against a second plaintiff who testified in the prior action); *cf. Portnoy v. Cessna Aircraft Co.,* 612 F.Supp. 1147, 1151 (S.D.Miss.1985) (denying plaintiff use of collateral estoppel because of "unfairness to defendant" based on the plaintiff in the first action having "particularly sympathetic circumstances justifying relief").

17. Continental has moved for production of two documents written by plaintiffs' counsel (dated December 4, 1982 and January 19, 1983) concerning litigation strategy in *McLendon.* The court, after *in camera* review of these documents, denies Continental's motion. The court places copies of these documents under seal.

claims. Therefore, the court grants plaintiffs' motion for partial summary judgment.[18]

The court directs plaintiffs' counsel to submit a proposed order regarding the rulings contained in the court's opinion.[19] The court further directs plaintiffs' counsel to submit a separate proposed order regarding suggested procedures for the continued litigation of plaintiffs' ERISA and RICO claims.

---

**18.** Plaintiffs, in their reply brief, request that the court strike 80 affidavits submitted by Continental in opposition to this motion, as violative of Federal Rule of Civil Procedure 56(e), and that the court otherwise sanction Continental for these submissions. Continental, in its surreply brief on plaintiffs' partial summary judgment motion, addressed plaintiff's contentions. At oral argument on the partial summary judgment motion, the parties addressed the propriety of the affidavits. Therefore, though no formal motion papers were filed, the court treats plaintiffs' request in its reply brief as a motion.

According to Continental, the affidavits are addressed to the question of "whether the 'plan' was in fact implemented at any of the plants involved in the present action." Surreply in Opposition to Plaintiffs' Motion for Partial Summary Judgment, at 10. In the face of *Gavalik*'s holding that adoption of the plan, in and of itself, violates § 510 of ERISA, the court finds Continental's affidavits to be irrelevant to the present motion. The court reserves as to the question of potential sanctions against Continental until the conclusion of the litigation.

**19.** Therefore, the court denies Continental's motions to strike proposed orders as moot.