703 A.2d 306

BRADFORD WOODRICK AND DONNA WOODRICK, PLAINTIFFS–RESPONDENTS, v. JACK J. BURKE REAL ESTATE, INC. DBA FOX & LAZO REALTORS, MAXINE BRIMMER AND CHARLES FRANK, DEFENDANTS, AND FOX & LAZO, INC., REALTORS, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued November 12, 1997—Decided December 9, 1997.

64

Before Judges LONG, KLEINER and KIMMELMAN.

*Sean T. O'Meara* argued the cause for appellant (*Archer & Greiner*, attorneys for appellant; *Mr. O'Meara*, of counsel and on the brief).

*David F. Swerdlow* argued the cause for respondents (*Jamieson, Moore, Peskin & Spicer*, attorneys; *Michael F. Spicer*, of counsel; *Mr. Swerdlow*, on the brief).

The opinion of the court was delivered by

LONG, P.J.A.D.

On October 18, 1990, plaintiffs, Bradford and Donna Woodrick, filed a complaint in which they alleged that Jack Burke Real Estate, Inc., (Burke) acting as an agent of Fox & Lazo Realtors, made certain misrepresentations to them in connection with the sale of their residence on Cleveland Avenue in Trenton which caused the breach of that contract and which delayed the closing of the Woodricks' purchase of a new home on Fleetwood Drive in Hamilton. The Woodricks asserted claims for negligence, fraud, breach of fiduciary duty, and breach of contract. They also alleged a cause of action pursuant to the Consumer Fraud Act, *N.J.S.A.* 56:8–1 to 8–20, which allows the recovery of treble damages, attorneys' fees, filing fees and reasonable costs of suit for unlawful trade practices.

After discovery was completed and following the September, 1993 sale of Burke's assets to Fox & Lazo, the attorneys representing Burke withdrew as counsel from the case. Judge Rosemarie R. Williams ordered that Burke obtain new counsel and enter a new appearance within thirty days or the Woodricks would be permitted to seek, ex parte, the entry of a default judgment. Burke failed to comply with the order and apparently abandoned its defense of this lawsuit. Accordingly, Judge David J. Schroth entered a default against Burke on February 25, 1994.

The Woodricks filed a motion for entry of final judgment by default. In that motion, they claimed damages in the amount of $35,072.33, comprised of (1) occupancy charges for the Fleetwood Drive property; (2) interest on a home equity loan needed to finance the down payment on the Fleetwood Drive property; (3) maintenance costs for the Cleveland Avenue property; (4) additional costs of a second closing for the Fleetwood Drive property; (5) depreciation of the Cleveland Avenue property; and (6) lost interest income. On September 9, 1994, a final judgment by default was entered against Burke awarding treble damages in the amount of $105,216.99, with post-judgment interest to accrue thereon, plus reasonable attorneys' fees.

On the same date, Judge Schroth granted the Woodricks' motion to amend the complaint to add Fox & Lazo, Maxine Brimmer and Charles Frank [1] as additional defendants in the case. In the Amended Complaint, the Woodricks alleged that Fox & Lazo was liable for Burke's obligations to them under principles of apparent authority or agency as well as under the doctrine of corporate successor liability. Answers were filed and Fox & Lazo moved to vacate the default judgment. The Woodricks opposed this motion and filed a cross-motion for summary judgment, seeking a ruling that Fox & Lazo should be held liable for the judgment against Burke as a successor corporation.

Judge Schroth, finding that it would be "eminently unfair" in the absence of any exceptional circumstances to reopen the case and allow Burke and Fox & Lazo "another bite at the apple," denied Fox & Lazo's motion to vacate the default judgment. Judge Schroth also found that Fox & Lazo's purchase of Burke's assets was a de facto merger, resulting in a mere continuation of the predecessor's business. On that basis, he granted summary judgment in favor of the Woodricks, leaving Fox & Lazo liable for the full amount of the default judgment entered against Burke in

---

[1] Brimmer and Frank were apparently sales agents for Burke and were involved in the original transaction between the Woodricks and Clark.

1994 under a theory of corporate successor liability. Final orders incorporating these decisions were entered on June 21, 1996.

On December 20, 1996, an order was entered granting final judgment in favor of the Woodricks against Fox & Lazo in the amount of $105,216.99, with post-judgment interest in the amount of $9,786.94 accrued through November 8, 1996, plus continuing post-judgment interest and costs. The determination of attorneys' fees payable by the defendants was stayed, pending appeal. The Woodricks' claims against Maxine Brimmer and Charles Frank, as well as their claims against Fox & Lazo based on other theories of liability were dismissed, subject to reinstatement in the event that Fox & Lazo was successful in appealing the grant of summary judgment.

Fox & Lazo appeals from the trial judge's denial of its motion to vacate the default judgment entered against Burke; from the award of treble damages; and from the grant of partial summary judgment in favor of the Woodricks, finding Fox & Lazo liable for the full amount of the judgment under the doctrine of corporate successor liability.

The underlying facts in the case established on the motions are as follows: In 1989, the Woodricks listed their Cleveland Avenue residence for sale with Burke which was then doing business under the trade name of Fox & Lazo Realtors. Upon such listing, the Woodricks were supplied with a Fox & Lazo brochure, promising (among other things) that their Fox & Lazo sales agent would pre-qualify any buyer prior to accepting any agreement to sell and would assist any buyer in obtaining a suitable mortgage. The Woodricks allege that Burke, despite its knowledge of Christine Clark's poor credit history, presented Clark as a person who would be able to obtain a mortgage commitment and recommended that the Woodricks sell their home to her.

On October 3, 1989, the Woodricks entered into a contract to sell their Cleveland Avenue property to Christine Clark for $75,-000, with the $3,650 deposit to be held in escrow by the Dollar Mortgage Co. Burke agreed to provide the escrow funds to Dollar

Mortgage prior to closing. Subsequently, on October 31, 1989, the Woodricks entered into a contract to purchase a residence located on Fleetwood Drive in Hamilton Square from Robert Chadwick, which agreement was contingent upon the sale of the Woodricks' Cleveland Avenue home to Clark. A joint closing of these two sales was scheduled to take place December 21, 1989.

Dollar Mortgage failed to provide the mortgage funds for Clark's purchase of Woodrick's Cleveland Avenue property at closing. As a result, without the proceeds from the Cleveland Avenue property, the Woodricks were unable to close on the purchase of the Fleetwood Drive residence. The Woodricks allege that, based upon the assurances of Burke that Dollar Mortgage would provide the certified funds by January 4, 1990, they entered into an occupancy agreement with Robert Chadwick for the Fleetwood Drive property under which they accrued charges of $100 per day. The sale of the Cleveland Avenue property to Clark never took place and Dollar Mortgage Co. never returned the deposit monies. The Woodricks allege that Burke failed in its duty to investigate the licensed status of Dollar Mortgage Co. As it turned out, Dollar Mortgage was not a licensed mortgage banker.

When Clark was unable to obtain mortgage financing through other sources, the Woodricks were forced to obtain a home equity loan in the amount of $17,000 in order to close the purchase of the Fleetwood Drive property on March 27, 1990. The Woodricks, who had accrued $9,100 in occupancy charges before the eventual closing, executed an interest-bearing note payable to Robert Chadwick, as well as a Mortgage secured by both properties owned by the Woodricks. Unable to find a buyer for the Cleveland Avenue property, the Woodricks rented it and incurred maintenance costs.

The Woodricks claim that the following damages (accrued as of the close of July, 1994) were caused by the negligent or fraudulent actions of Burke:

| | |
|---|---|
| Occupancy Charges for Fleet-wood (including interest earned and legal fees incurred) | $12,412.43 |
| Costs of Maintaining Cleveland Ave. (including mortgage inter-est, home equity loan interest, homeowner's insurance, proper-ty taxes, maintenance and repair costs, less rentals received) | 17,507.30 |
| Costs of second closing (includ-ing lost wages, miscellaneous fees, legal fees) | 2,140.65 |
| Lost interest from aborted sale | 2,394.25 |

As a result of the damages incurred by the Woodricks, this suit was commenced against Burke in October, 1990.

The following is an outline of the facts surrounding the relation-ship of Burke with Fox and Lazo. In September, 1977, Burke obtained a license to use the name "Fox & Lazo" in connection with its operation of a real estate brokerage firm. The licensing arrangement did not grant Fox & Lazo any ownership interest in Burke and, by its terms, did not create any relationship of a partnership, joint venture, agency or independent contractor. In return for such license, Burke agreed to pay Fox & Lazo a percentage of all net sales commissions.

On September 29, 1993, Burke, along with John J. Burke, Jr., individually, and Fox & Lazo, entered into an Asset Purchase Agreement whereby Fox & Lazo purchased certain assets and accounts payable of Burke, including (1) all furniture, furnishings, fixtures and equipment utilized by Burke in the operation of its business; (2) all commissions or other payments arising out of Burke's active residential listing agreements as of 9/30/93; (3) all pending residential real estate sale contracts under which Burke was entitled to a fee or commission (totalling $424,948.07); and (4) all books and records of Burke, including customer lists.

With regard to liabilities, Fox & Lazo undertook to assume certain specified obligations of Burke under office leases,[2] equipment leases and maintenance agreements. Except for those liabilities expressly assumed, the Agreement stated that Fox & Lazo did not assume any other liabilities of Burke, and Burke remained liable for the remainder of its obligations. Burke also agreed to pay certain accrued operating expenses totalling $265,-769.52. Paragraph 2.6 of the Agreement, "Liabilities: Creditors," also stated, in relevant part:

> Except with respect to those liabilities of Seller which this Agreement expressly provides to be assumed by Buyer, Seller has no liability of any kind whatsoever, whether absolute or contingent and whether or not currently determinable, which is or could become binding upon or a liability to Buyer or the Assets, nor has any condition existed or any event occurred which could reasonably be expected to give rise to such liability.

Paragraph 2.18, "Litigation" contained the representation of Burke that:

> Except as set forth on *Schedule 2.18*, there is no suit, claim, investigation, action or proceeding now pending or, to the knowledge of Seller, threatened, against Seller or its properties before any court, administrative or regulatory body, or any governmental agency....

Schedule 2.18 listed eight pending claims or litigations. Omitted from this list were at least two active litigations: this lawsuit filed by the Woodricks as well as the *Ellsworth* case.[3] Burke also

---

[2] The Asset Purchase Agreement indicates that at least four leases—Princeton Junction (two offices), North Brunswick, and Pennington—would be assumed by Fox & Lazo, with the Pennington and North Brunswick offices to be relocated and with the old Princeton Junction offices to be consolidated with the new location. As of March 1996, only one of the original locations is being used by Fox & Lazo.

[3] *Shawn Ellsworth d/b/a Ellsworth Realty Associates v. Karen J. Smith, Jack Burke Real Estate, Inc. and Fox & Lazo, Inc, Realtors*, Docket No. L-91-4939 (Law Div., March 29, 1996). The Law Division judge issued an order determining as a matter of law that the 1993 asset purchase agreement between Burke and Fox & Lazo resulted in a mere continuation or de facto consolidation of Burke's prior business operations sufficient to attach corporate successor liability to Fox & Lazo. The order thus granted partial summary judgment in favor of Ellsworth and against Fox & Lazo on that issue. Subsequently, the case was

provided letters of counsel, neither of which mentioned the contingent liability of Burke arising out of this lawsuit.

According to the Agreement, the purchase price of $550,000 was to be paid partly in cash ($250,000) to be used to pay off certain creditors of Burke, with the remaining $300,000 to be applied as a credit against the $400,000 debt then currently owed to Fox & Lazo under the 1977 licensing agreement. The Agreement provided for no transfer of any ownership interest in Fox & Lazo to Burke.

Following the closing, Burke was dissolved. According to interrogatories served upon Fox & Lazo in the *Ellsworth* case,[4] effective upon the closing of the Asset Purchase Agreement, John J. Burke, Jr. became a Vice President and Regional Manager of Fox & Lazo, Central New Jersey. Fox & Lazo retained at least 9 key employees and 156 independent sales agents of Burke. According to Fox & Lazo's President, only ten employees or sales agents were not retained.

On appeal, Fox & Lazo claims the trial judge erred in finding that Fox & Lazo's acquisition of the corporate assets of Burke constituted a de facto merger or mere continuation of the business Burke. In support of that argument, Fox & Lazo alleges that (1) Jack Burke received no stock in exchange for its assets and thus no ownership interest in the successor corporation; (2) there was no continuity of management after the acquisition; and (3) Fox & Lazo did not assume those obligations of Burke which were necessary for the uninterrupted continuation of its business. In essence, Fox & Lazo argues that its general continuation of the business of Burke is not enough in itself to warrant the imposition of corporate successor liability. In the alternative, Fox & Lazo argues that the default judgment entered against Burke should be

---

resolved by a settlement in which Ellsworth was to receive $15,000 from Fox & Lazo. See *IV, infra.*

[4] Both parties rely on discovery conducted in the *Ellsworth* case for factual support.

vacated and Fox & Lazo should be allowed to defend the case on its merits. Finally, Fox & Lazo argues that, in no event should the Woodricks be allowed to recover treble damages.

The Woodricks counter that the trial judge properly determined that Fox & Lazo, as a successor corporation, should be liable for Burke's obligations because (1) the acquisition resulted in a continuation of the management, personnel, physical location, assets and general business operations of Burke; (2) Burke ceased to exist after the acquisition; and (3) Fox & Lazo assumed all of the liabilities of Burke which were necessary for the continuation of the predecessor's business.

The Woodricks also contend that Fox & Lazo should be barred from relitigating the issue of its corporate successor liability for the debts of Burke under the doctrine of "issue preclusion." Because another judge previously ruled in the *Ellsworth* case that Fox & Lazo's purchase of the assets of Burke resulted in "a mere continuation or de facto consolidation" of the business operations of Burke, the Woodricks urge that the issue of Fox & Lazo's liability for the obligations of Burke not be reopened.

With regard to the trial judge's denial of Fox & Lazo's motion to vacate the default judgment, the Woodricks argue that the trial judge did not abuse his discretion. Although the Woodricks dispute the applicability of *R.* 4:50-1(f) to these circumstances, they argue that Fox & Lazo has demonstrated neither exceptional or compelling circumstances nor a meritorious defense warranting such relief.

We have carefully reviewed this record in light of both parties' contentions and have concluded that our intervention is unwarranted.

## I

It is, as Fox & Lazo argues, well-established that where one company sells or otherwise transfers all of its assets to another company, the transferee of those assets is not ordinarily

liable for the debts of the transferor company, including those arising out of the transferor's tortious conduct. *Ramirez v. Amsted Industries, Inc.*, 86 *N.J.* 332, 340, 431 *A.2d* 811 (1981) (citations omitted). Under this traditional approach, four well-established exceptions exist: where (1) the purchasing corporation expressly or impliedly agrees to assume such debts and liabilities; (2) the transaction amounts to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction is entered into fraudulently in order to escape responsibility for such debts and liabilities. *Ibid.* A fifth exception has been adopted in products liability cases where the successor corporation undertakes to manufacture essentially the same products as the predecessor. *Id.* at 347–48, 431 *A.2d* 811 (rejecting the approach of *McKee v. Harris–Seybold Co.*, 109 *N.J.Super.* 555, 264 *A.2d* 98 (Law Div.1970), *aff'd* 118 *N.J.Super.* 480, 288 *A.2d* 585 (App.Div. 1972) which focused on the form of the corporate transaction in the context of products liability cases, instead of on the successor's actual continuation of the manufacturing operations).

This case presents the issue of whether Fox & Lazo's acquisition of Burke's assets constituted either a de facto merger or a mere continuation of the predecessor's business. Because these two exceptions to the general rule of non-liability tend to overlap, with much of the same evidence being relevant to each determination, these exceptions are often treated in unison. *Glynwed, Inc. v. Plastimatic, Inc.*, 869 *F.Supp.* 265, 276 (D.N.J. 1994) (applying New Jersey law on the issue of corporate successor liability); *See Luxliner P.L. Export, Co. v. RDI/Luxliner, Inc.*, 13 *F.*3d 69, 73 (3rd Cir.1993) (also applying New Jersey law); *Lumbard v. Maglia, Inc.*, 621 *F.Supp.* 1529, 1535 (S.D.N.Y.1985).

In determining whether a particular transaction amounts to a de facto consolidation or mere continuation, most courts consider four factors: (i) continuity of management, personnel, physical location, assets, and general business operations; (ii) a cessation of ordinary business and dissolution of the predecessor as soon as practically and legally possible; (iii) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor; and (iv) continuity of ownership/shareholders. [ (citations omitted).]

> "Not all of these factors need be present for a de facto merger or continuation to have occurred." *Luxliner*, 13 *F*.3d at 73 (citing *Good v. Lackawanna Leather Co.*, 96 *N.J.Super.* 439, 452, 233 *A*.2d 201 (1967)); see also [*Menacho v. Adamson United Co.*, 420 *F.Supp.* 128, 133 (D.N.J.1976) (applying New Jersey law)]. Rather, "[t]he crucial inquiry is whether there was an 'intent on the part of the contracting parties to effectuate a merger or consolidation rather than a sale of assets.'" [*Luxliner, supra*, 13 *F*.3d at 73 (citing *McKee, supra*, 109 *N.J.Super.* at 567, 264 *A*.2d 98)].
>
> [*Glynwed, supra*, 869 *F.Supp.* at 275–76.]

In *McKee, supra*, 109 *N.J.Super.* 555, 264 *A*.2d 98, the court separately analyzed the de facto merger and the "mere continuation" exceptions. With respect to the latter, the *McKee* court emphasized the importance of finding continuity of management and continuity of stockholder interests before imposing liability upon the successor; under the *McKee* approach, continuity of operations is not enough to find that the successor is a "mere continuation."

> When one company purchases all the assets of another, it is to be expected that the purchasing corporation will continue the operations of the former, but this does not by itself render the purchaser liable for the obligations of the former. For liability to attach, the purchasing corporation must represent merely a "new hat" for the seller.
>
> [*McKee, supra*, 109 *N.J.Super.* at 570, 264 *A*.2d 98 (citation omitted).]

Approximately six years after *McKee*, another Law Division judge criticized its approach to the de facto merger and "mere continuation" exceptions as too narrow. *Wilson v. Fare Well Corp.*, 140 *N.J.Super.* 476, 486, 356 *A*.2d 458 (Law Div.1976). He declared that "the most relevant factor is the degree to which the predecessor's business entity remains intact. The more a corporation physically resembles its predecessor, the more reasonable it is to hold the successor fully responsible." *Id.* at 490, 356 *A*.2d 458. Even where the usual elements of a de facto merger—a transfer of stock, and retaining the same physical location and employees—are absent, a mere continuation may be found where the facts show that the intent was for the successor to assume all the benefits and burdens of the predecessor's business, with the successor becoming a "new hat" for the predecessor. *Id.* at 491, 356 *A*.2d 458.

Thereafter, federal courts followed the broader approach of *Wilson* in that continuity of shareholder investment is no longer viewed as being dispositive of the issue of de facto merger or continuation. *See Atlas Tool Co., Inc. v. Commissioner of Internal Revenue*, 614 *F*.2d 860, 871 (3rd Cir.1980) (finding a continuation of stockholder interest even though no stock transfer occurred), *cert. denied, sub nom. Schaffan v. Comm'r of Internal Revenue*, 449 *U.S.* 836, 101 *S.Ct.* 110, 66 *L.Ed.*2d 43 (1980); *Luxliner, supra*, 13 *F*.3d at 73 (whether stock was part of the purchase price for the predecessor's assets is only one factor to be considered); *Glynwed, supra*, 869 *F.Supp.* at 277 (New Jersey does not require that the shareholders of the predecessor become shareholders of the successor through the use of the successor's stock in payment for the predecessor's assets).

Fox & Lazo's reliance on *McKee* for the proposition that a de facto merger is precluded where the predecessor corporation receives no ownership interest in the successor corporation, omits consideration of the more modern view of New Jersey law as no longer requiring continuity of shareholder interest.

> Strict interpretation of the traditional corporate law approach leads to a narrow application of the exceptions to nonliability, and places unwarranted emphasis on the form rather than the practical effect of a particular corporate transaction.... Traditionally, the triggering of the "de facto merger" exception has been held to depend on whether the assets were transferred to the acquiring corporation for shares of stock or for cash—that is, whether the stockholders of the selling corporation became the stockholders of the purchasing corporation. [ (citations omitted).] Under a narrow application of the McKee exception of de facto merger no liability is imposed where the purchasing corporation paid for the acquired assets principally in cash.
>
> [*Ramirez, supra*, 86 *N.J.* at 341–42, 431 *A*.2d 811.]

The Supreme Court, in *Ramirez*, observed that other courts have broadened the *McKee* approach to the de facto merger and mere continuation exceptions in order to expand corporate successor liability. *Id.* at 343, 431 *A*.2d 811. Although *Ramirez* adopted the approach of the California Supreme Court in *Ray v. Alad Corp.*, 19 *Cal.*3d 22, 136 *Cal.Rptr.* 574, 560 *P*.2d 3 (1977) which created a "product line" exception in product defect cases, it at least implicitly accepted the "inroads into the traditional princi-

ples of corporate successor nonliability expressed in *McKee*" by citing, with apparent approval, the decision of the Michigan Supreme Court in *Turner v. Bituminous Cas. Co.*, 397 *Mich.* 406, 244 *N.W.*2d 873 (1976). *Turner*, in turn, "reasoned that there was no practical basis for treating a cash purchase of corporate assets any differently than an acquisition of assets for stock...." *Ramirez, supra*, 86 *N.J.* at 345, 431 *A.*2d 811 (citing *Turner, supra*, 244 *N.W.*2d at 880). Therefore, although there is no New Jersey Supreme Court case directly on point, it appears that a corporate successor can no longer avoid liability by simply structuring a cash-for-assets sale. In other words, the structure of the Burke to Fox & Lazo transaction does not prohibit a finding of corporate successor liability.

With regard to other legally relevant factors, it is uncontroverted that Fox & Lazo assumed a significant portion, if not all, of the liabilities necessary for the continuation of the business of Burke. Despite the broad disclaimer of liability in the Asset Purchase Agreement, Fox & Lazo assumed veritably every obligation necessary for the day-to-day functioning of Burke. Aside from the termination of some office leases, Fox & Lazo has not identified any liabilities of Burke it did not assume.

Also, Burke ceased to exist after the transaction. Even though the Asset Purchase Agreement did not expressly provide for the dissolution of this business, the transaction by its structure—by virtue of the transfer of all active real estate listings and contracts to Fox & Lazo—contemplated this result. All that remained of Burke was a shell corporation with no ability to pay debts. Because the consideration consisted solely of a forgiveness of debt as well as a payoff of Jack Burke's creditors, the sale to Fox & Lazo left Burke impecunious.

Most importantly, it is evident from the structure of the deal that it was the intent of Fox & Lazo to absorb and continue the operation of Burke. John J. Burke, Jr., a signatory on the Asset Purchase Agreement, became an officer of Fox & Lazo and assumed management over the business operations that he sold to

Fox & Lazo; thus, there was continuity of management. Also, except for ten employees, at least 165 sales agents and key employees were retained by Fox & Lazo in the capacities they held at Burke.

Based on the foregoing facts, it appears that the intent of the asset purchase transaction was to effectuate a merger of the two firms. This transaction resulted in nothing more than a change of hat for Burke, thus constituting a mere continuation of the predecessor's business. The fact that Burke had previously worn that hat as a licensee of the Fox & Lazo trade name does not change the outcome. We therefore, conclude that Judge Schroth correctly determined that Fox & Lazo should be liable for the debts of Burke as a result of the de facto merger between the two companies and reject Fox & Lazo's argument to the contrary.

## II

We also disagree with Fox & Lazo's contention that Judge Schroth abused his discretion in refusing to vacate the default judgment against Burke under *R.* 4:50–1. More than two years after the entry of a default against Jack Burke in February, 1994, and approximately nineteen months after the entry of a default judgment and receipt of an amended complaint naming it as a defendant in September, 1994, Fox & Lazo came to the trial judge seeking a vacation of the default judgment against Burke. Although Fox & Lazo acknowledges that such relief should be granted only in exceptional circumstances, *Baumann v. Marinaro*, 95 *N.J.* 380, 395, 471 *A.*2d 395 (1984), it has failed to demonstrate any such circumstances here. In fact, the only reason why it argues that the relief is appropriate is that it "reasonably believed that [corporate successor liability] was not a valid theory against it . . . ." In effect, Fox & Lazo admits that it was well aware of the default and default judgment against Burke and made a decision not to defend itself because it felt confident that was insulated from liability. Given that *McKee* was called into question as early as 1976 and *Ramirez* was decided in 1981, the solidity of that legal

judgment is questionable. But even if this was not so, and a meritorious defense was plausible, no excusable neglect was shown here. *See Mancini v. EDS*, 132 *N.J.* 330, 334, 625 *A.*2d 484 (1993) (party seeking to reopen default judgment must show excusable neglect and a meritorious defense). Fox and Lazo simply chose not to defend an action it was well aware of.

Fox & Lazo also argues that the high amount of the treble damages award constitutes an "exceptional circumstance" warranting the vacation of the default judgment. Absent a trial on the fraud issue, Fox & Lazo claims that it is highly inequitable to hold it liable for the full amount of the award. We disagree. The Consumer Fraud Act is an important legislative initiative aimed at deterring unlawful sales and advertising practices designed to induce consumers to purchase merchandise or real estate, *Daaleman v. Elizabethtown Gas Co.*, 77 *N.J.* 267, 270, 390 *A.*2d 566 (1978). If a defendant in a lawsuit brought under this act could avoid treble damages by defaulting and simply be held liable for the actual damages, (which is, in effect, what Fox & Lazo is arguing here) the Act would lose much of its efficacy. To reduce the treble damages award to the amount of actual damages simply because it was the product of a default judgment would, in our view, be contrary to the intent of the legislature. *See N.J.S.A.* 56:8–19.

In sum, Judge Schroth correctly concluded that this case does not present the kind of exceptional circumstances that warrant the vacation of a default judgment pursuant to *R.* 4:50–1(f). *Housing Authority of Town of Morristown v. Little*, 135 *N.J.* 274, 286, 639 *A.*2d 286 (1994).

### III

Fox & Lazo also questions the trial judge's calculation of damages, claiming, among other things, double counting. We have canvassed this record for support for these allegations and find none. The judge's calculation was a mathematically accurate

cumulation of damages which the record reveals that the Woodricks incurred. *R.* 2:11–3(e)(1)(A).

## *IV*

Although our other rulings and the Woodrick's failure to cross-appeal make it unnecessary for us to address their contention that Fox & Lazo should have been barred from relitigating the issue of successor liability under the doctrine of issue preclusion, we choose to do so.

In *Shawn Ellsworth d/b/a Ellsworth Realty Associates v. Karen J. Smith, Burke, Inc. and Fox & Lazo, Inc, Realtors,* Docket No. L–91–4939 (Law Div., March 29, 1996), Judge Yaskin ruled that Fox & Lazo should be liable for an obligation of Burke under the doctrine of corporate successor liability. Following this decision, the parties settled for $15,000 and Judge Yaskin consented to the vacation of her earlier order. At the hearing of the summary judgment motion and on appeal, the Woodricks argue that Fox & Lazo should be collaterally estopped from relitigating the issue of their liability based on Judge Yaskin's previous order. We disagree.

"Collateral estoppel is that branch of the broader law of res judicata which bars relitigation of any issue which was actually determined in a prior action, generally between the same parties, involving a different claim or cause of action." *State v. Gonzalez,* 75 *N.J.* 181, 186, 380 *A.*2d 1128 (1977) (citations omitted). Collateral estoppel extends to questions of fact, mixed questions of fact and law and, where injustice would otherwise result, to questions of law. *Id.* at 187, 380 *A.*2d 1128. With regard to the requirement of mutuality of estoppel, which limits the application of collateral estoppel to parties and their privies, the Supreme Court has adopted a more flexible approach whereby the absence of mutuality does not necessarily preclude application of the doctrine. Instead, the court should consider mutuality, along with all the other pros and cons of applying the doctrine to the particular case, to avoid an unjust result. *Id.* at 191, 380 *A.*2d 1128. The doctrine

should not be applied "to a non-party where the economy of resorting to the doctrine is substantially outweighed by considerations of fairness, particularly where the doctrine is invoked offensively rather than defensively." *Perry v. Tuzzio,* 288 *N.J.Super.* 223, 232, 672 *A.*2d 213 (App.Div.1996) (citing *Gonzalez, supra,* 75 *N.J.* at 186, 380 *A.*2d 1128) (citations omitted).

In this case, the Woodricks raised collateral estoppel offensively against Fox & Lazo. Although the Woodricks were not a party to the *Ellsworth* case, Fox & Lazo was a party to that action and had a full and fair opportunity to defend itself on the issue of its liability as the corporate successor of Burke before Judge Yaskin. *See McLendon v. The Continental Group, Inc.,* 660 *F.Supp.* 1553, 1560 (D.N.J.1987). Therefore, the need for mutuality would not seem to preclude the application of collateral estoppel against Fox & Lazo in this case.

Generally, where a party invokes collateral estoppel to preclude litigation of a particular issue, that party must establish (1) that the issue upon which preclusion is sought is identical to the issue involved in the prior action; (2) that the issue was actually litigated in the prior action; (3) that the issue had been determined by a valid and final judgment; and (4) the determination of that issue was essential to the prior judgment. *McLendon, supra,* 660 *F.Supp.* at 1560. In this case, all the elements have been met, except for the third. Section 13 of the Restatement (Second) of Judgments provides, in relevant part:

> For purposes of issue preclusion ..., "final judgment" includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect.

A vacated judgment bears no conclusive effect on the underlying action; therefore, in our view, it has no status as a final judgment for purposes of other actions. In fact, the Comments to Section 13 indicate that whether the decision was subject to appeal or was in fact reviewed on appeal is a factor indicating finality of the judgment. Because this vacated judgement was not subject to

appeal, it was not "final" for purposes of issue preclusion. *See McLendon, supra,* 660 *F.Supp.* at 1562.

The Woodricks rely on *Bates v. Union Oil Co. of California,* 944 *F.*2d 647, 650 (9th Cir.1991), *cert. denied, sub nom. Union Oil Co. of California v. Bates,* 503 *U.S.* 1005, 112 *S.Ct.* 1761, 118 *L.Ed.*2d 424 (1992), for the proposition that a judgment should not be denied preclusive effect simply because it was vacated. *Bates* held that a trial judge should balance "the competing values of finality of judgment and the right to relitigation of unreviewed disputes" before vacating a judgment. Where the trial judge properly considers those factors, the vacated judgment will lose preclusive effect. *Bates,* 944 *F.*2d at 650. *Bates* does not stand for the blanket proposition that vacated judgments automatically should be given preclusive effect. *See Zeneca Ltd. v. Novopharm Ltd.,* 919 *F.Supp.* 193, 197 (D.Md.1996), *aff'd,* 111 *F.*3d 144 (Fed. Cir.1997). Furthermore, as observed in *Zeneca,* the trend in the Federal Circuits is to deny collateral estoppel effect to a vacated judgment. *Id.* at 196–197. "As a general rule, a vacated judgment and the factual findings underlying it have no preclusive effect; the judgment is a legal nullity." *Id.* at 196 (citations omitted). In sum, we find no error in Judge Schroth's refusal to apply collateral estoppel and his decision to decide the matter on its merits.

The judgment under review is affirmed.