**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3461-19

WHITECAP MARKETING, INC.,

    Plaintiff-Appellant,

v.

IMS TRADING, CORP.,

    Defendant,

and

IMS TRADING, LLC, and
CENTRAL GARDEN & PET CO.,

    Defendants-Respondents.

_____

Argued October 28, 2021 – Decided December 29, 2021

Before Judges Alvarez and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-5128-17.

David O. Marcus argued the cause for appellant (Shapiro, Croland, Reiser, Apfel & Di Iorio, LLP, attorneys; David O. Marcus, on the briefs).

Linda G. Harvey argued the cause for respondents (Greenberg Dauber Epstein & Tucker, PC, attorneys; Linda G. Harvey and Kathryn B. Hein, on the brief).

PER CURIAM

Plaintiff Whitecap Marketing, Inc. appeals the grant of summary judgment to defendants IMS Trading LLC (Trading LLC) and Central Garden & Pet Company (Central). Whitecap does not appeal the earlier dismissal of IMS Trading Corp., a third defendant. We vacate the grant of summary judgment to Trading LLC and Central and remand for further proceedings.

Whitecap began providing sales and marketing services to IMS Trading Corp., a dog chew manufacturer, in 1998. In 2008, the parties agreed in writing to expand Whitecap's responsibilities to include IMS Trading Corp.'s grocery store sales. The fee schedule attached to the 2008 agreement specified Whitecap would be paid a three percent commission, and four percent for two specific customers. The 2008 fee schedule was amended in 2009, 2010, and 2012, and the commissions ranged from three to six percent. The 2012 amendment, however, set the fees for two specific customers at two percent.

Between 2008 and 2015, IMS Trading Corp.'s annual grocery sales increased from approximately $200,000 to $12,000,000. On July 13, 2015, Whitecap secured a major contract for IMS Trading Corp. with Delhaize, a

2

management company for two major grocery store chains, effective through November 30, 2017.

In 2015, Central, which operated its own dog chew businesses, formed a subsidiary—Trading LLC—in order to purchase IMS Trading Corp.'s assets. The asset purchase agreement (APA), signed on April 30, 2015, provided that Trading LLC would purchase substantially all of IMS Trading Corp.'s corporate assets, but only certain specified liabilities. Trading LLC assumed the accounts payable, accrued expenses, and the lease for IMS Trading Corp.'s Wood Ridge facility, but did not agree to assume IMS Trading Corp.'s contract with Whitecap. The APA stated that Trading LLC was not "bound by any [of IMS Trading Corp.'s] agreement[s], contract[s] or other commitment[s]."

The acquisition closed on July 31, 2015. IMS Trading Corp., now known as BGG Corporation, retained some assets and liabilities and continued making corporate filings in New York and New Jersey. IMS Trading Corp. also continued actively defending itself in a class action products liability suit, which settled in 2019. It remained registered as an active New York corporation as of September 10, 2019.

Sam Blachorsky, IMS Trading Corp.'s president, testified at his deposition that after the APA, "there were no assets of [IMS Trading Corp.] other than what

3

we put in to pay some bills." He further stated that the company's business activities only included winding down a lawsuit, and that he planned to then close it down.

After July 31, 2015, one of Whitecap's owners, David Kofsky, met with Central's Chief Executive Officer, Glen Axelrod. Kofsky alleges Axelrod said he "expected to have business as usual[.]" But defendants contend they explained they were only agreeing to temporarily continue working with Whitecap until they decided whether to maintain the sales relationship at all. In August and September, Trading LLC paid Whitecap commission fees in accordance with the 2008 agreement as amended.

In October 2015, Trading LLC proposed an "amendment" (proposal) to "their prior agreement" with Whitecap that would reduce commissions for all customer accounts to two percent and allow either party to terminate the arrangement with thirty days' written notice. Whitecap counter-proposed an average fee of three percent, which Trading LLC declined.

Trading LLC moved its headquarters to Neptune and began operating as a single "business unit" with Central's two other dog chew companies. Executive officers from Central's other dog chew companies managed Trading LLC, but, Blachorsky stayed on as Trading LLC's president.

Trading LLC's operations continued from the Wood Ridge facility acquired in the APA, while warehouse operations for Trading LLC and Central's other dog chew companies moved in March 2017 to Monroe Township after Central completed construction of a new facility. After the acquisition, sixty-two former IMS Trading Corp. employees—mostly warehouse workers—continued working for Trading LLC. By June 2019, only eighteen remained, still mostly warehouse workers. Additionally, most of the IMS Trading Corp. employees at a facility in Mexico stayed on with Trading LLC. Central's internal sales staff began handling some of Trading LLC's customer accounts.

Trading LLC personnel informed customers about the APA in writing, by phone, and in person. Blachorsky assured a Costco representative via email that there would "be no changes in how IMS operates" despite the sale. A top executive at Trading LLC circulated an internal memo listing talking points for explaining the transition to customers that contained the language "[IMS Trading Corp.] has recently been acquired by [Central.]" Trading LLC initially told customers it had no plans to discontinue any product lines or raise prices. However, Trading LLC eventually designed new product packaging, chose some new vendors, acquired new equipment, and added ten new products to IMS

5

A-3461-19

Trading Corp.'s old product line. According to Axelrod, "[t]here [wasn't] much about the business that didn't change, with the exception of the brand name."

Meanwhile, Whitecap continued to market Trading LLC's products, and Trading LLC paid only two percent commissions for the remainder of their business relationship. On December 23, 2015, after receiving the October commission payment, Whitecap wrote to Central to request fees in line with the amended 2008 agreement and the rates Central paid for August and September. On February 16, 2016, Whitecap again emailed objecting to the two percent payments, but continued working with Trading LLC. Whitecap accepted the payments "without prejudice[,]" retaining its right to seek full payment. In April 2017, Trading LLC terminated its working relationship with Whitecap.

Whitecap alleges Trading LLC underpaid commissions by $285,855 between October 2015 and April 2017. Trading LLC paid no commissions at all for sales under the Delhaize contract after April 30, 2017.

In a twenty-two-page statement of reasons, the court explained its decision granting summary judgment to Trading LLC and Central. To summarize, the judge concluded no reasonable factfinder could view payment of two percent commissions or termination of the business relationship with thirty days' notice as a breach of contract. Instead, the court held there was no breach of contract,

A-3461-19

in part because defendants acted in accordance with the terms of the October 2015 proposal. The judge also rejected Whitecap's claim for quantum meruit damages, opining that Whitecap voluntarily continued to perform services for Trading LLC for eighteen months despite knowing Trading LLC would pay only two percent. Thus, she concluded Whitecap could not "establish it had a reasonable expectation of different compensation for those services."

On appeal, Whitecap raises the following points:

> POINT I
> THE TRIAL COURT'S AWARD OF SUMMARY JUDGMENT TO DEFENDANTS [CENTRAL] AND [TRADING LLC] WAS IMPROPER.
>
> A.     The Trial Court Erroneously Found that No Issue of Fact Exists as to Whether or Not the 2008 Representative Agreement was Breached by the Defendants.
>
> B.     Disputed Issues of Fact Exist as to Whether or not Defendants Assumed the Contract with Whitecap.
>
> C.     Disputed Issues of Fact Exist as to Whether or not [Trading LLC] is Liable Under the Agreement as the Successor to IMS [Trading] Corp[.]
>
> D.     The Court Erroneously Dismissed the Claim of Whitecap for Recovery of Commissions that [Trading LLC] was Obligated to Pay for Services Whitecap Provided to [Trading LLC] Under the Contract Before Whitecap's Termination.

E.     The Trial Court Erred in Granting Summary Judgment Dismissing Whitecap's Claim for Payment of Commissions for Sales Achieved Under the 2015 and 2017 Delhaize Requirements Contracts[.]

F.     The Trial Court Improperly Awarded Summary Judgment Dismissing [Whitecap's] Quantum Meruit Claim.

I.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 528-29 (1995) (quoting R. 4:46-2(c)). Disputed facts "of an insubstantial nature" cannot defeat a summary judgment motion. Ibid. (quoting Judson v. Peoples Bank & Tr. Co., 17 N.J. 67, 75 (1954)). A genuine issue of material fact exists when "the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Id. at 540. Appellate courts review summary judgment rulings de novo. Conley v. Guerrero, 228 N.J. 339, 346 (2017). We conclude a "rational factfinder" could decide defendants

were obligated to honor the terms of the 2008 agreement under a successor liability theory and that defendants breached their responsibilities.

A plaintiff suing for breach of contract must prove, among other things, that the parties entered into a contract. Globe Motor Co. v. Igdalev, 225 N.J. 469, 482 (2016). It is undisputed that Trading LLC never expressly assumed the 2008 contract. Indeed, they specifically declined to enter into any written agreement with Whitecap. But, the continuing relationship between the parties may have created a legally enforceable implied-in-fact contract. See St. Barnabas Med. Ctr. v. Cnty. of Essex, 111 N.J. 67, 77 (1988); see also Skuse v. Pfizer, Inc., 244 N.J. 30, 72 (2020) ("[W]ords or conduct can sometimes manifest assent and create an implied-in-fact contract.").

"Whether the parties acted in a manner sufficient to create implied contractual terms is a question of fact generally precluding summary judgment." Troy v. Rutgers, 168 N.J. 354, 366 (2001). Both parties rely on out-of-state law in support of their respective positions, which can be persuasive although not binding. See Ehrlich v. Sorokin, 451 N.J. Super. 119, 131 (App. Div. 2017); Sulcov v. 2100 Linwood Owners, 303 N.J. Super. 13, 30 (App. Div. 1997) ("Absent New Jersey precedent, it is appropriate to look to out-of-state cases for guidance.").

9

Central's assumption of some of IMS Trading Corp.'s liabilities does not necessarily imply it assumed all of them. But a reasonable factfinder could conclude Central's business dealings with Whitecap created a contractual relationship. Whitecap worked at the prior commission rate for two months after the sale. Whitecap then worked for Trading LLC until April 2017 under protest. Whitecap further alleges that defendants promised that business would continue as usual, and that the October 2015 proposal itself suggests the parties had a prior agreement, since Trading LLC characterized it as an amendment.

Clearly, defendants did not include the 2008 agreement in the APA. But Whitecap and Trading LLC developed a relationship after the APA closed. Whitecap, of course, was not a party to the APA. Defendants continued to operate under the terms of the 2008 agreement for two months, began utilizing Whitecap's services immediately upon taking control of the assets, and characterized their October 2015 proposal as an amendment to a prior agreement. A reasonable factfinder could conclude defendants impliedly assumed the 2008 agreement.

II.

Generally, "when a company sells its assets to another company, the acquiring company is not liable for the debts and liabilities of the selling

10

company simply because it has succeeded to the ownership of the assets of the seller." Lefever v. K.P. Hovnanian Enters., 160 N.J. 307, 310 (1999). There are three relevant exceptions: "(1) the successor expressly or impliedly assumes the predecessor's liabilities; (2) there is an actual or de facto consolidation or merger of the seller and the purchaser; [or] (3) the purchasing company is a mere continuation of the seller[.]" Ibid. As a "necessary predicate to a finding of successor liability[,]" the successor company must acquire "all or substantially all" the predecessor's assets. 160 W. Broadway Assocs., LP v. 1 Mem'l Drive, LLC, 466 N.J. Super. 600, 613 (App. Div. 2021).

A reasonable factfinder could decide that a de facto merger or "mere continuation" occurred here. The de facto merger and mere continuation exceptions "tend to overlap," and so "are often treated in unison." Woodrick v. Jack J. Burke Real Est., 306 N.J. Super. 61, 73 (App. Div. 1997). Courts assess four factors when determining whether these exceptions apply:

> (i) continuity of management, personnel, physical location, assets, and general business operations; (ii) a cessation of ordinary business and dissolution of the predecessor as soon as practically and legally possible; (iii) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor; and (iv) continuity of ownership/shareholders.

A-3461-19

[160 W. Broadway Assocs., LP, 466 N.J. Super. at 611.]

"Not all of these factors need be present for a de facto merger or continuation to have occurred."  Woodrick, 306 N.J. Super. at 74 (quoting Luxliner P.L. Exp. Co. v. RDI/Luxliner, Inc., 13 F.3d 69, 73 (3d Cir. 1993)). Continuation occurs "where the facts show that the intent was for the successor to assume all the benefits and burdens of the predecessor's business, with the successor becoming a 'new hat' for the predecessor."  Ibid.  Further, "a corporate successor [cannot] avoid liability by simply structuring a cash-for-assets sale [as opposed to acquiring the entire company]."  Id. at 76.  But "successor liability does not impose responsibility based on incidental use of a predecessor's name or for fostering the continued use of the product."  Saez v. S & S Corrugated Paper Mach. Co., 302 N.J. Super. 545, 554 (App. Div. 1997).

In Woodrick, for example, one real estate agency purchased the assets and "a significant portion, if not all, of the liabilities necessary for the continuation of the business" of another.  306 N.J. Super. at 67.  The predecessor agency was left a "shell corporation with no ability to pay debts" and ceased to exist "by virtue of the transfer[.]"  Id. at 76.  Nearly all employees began working for the successor, and one of the predecessor's key executives became an officer of the successor where he managed the "operations that he sold to" the successor.  Id.

at 76-77. The plaintiff sought to recover from the successor based on an agreement with the predecessor. Ibid. The court affirmed summary judgment for the plaintiff, finding a de facto merger and mere continuation because "it [was] evident from the structure of the deal that it was the intent of [the successor] to absorb and continue the operation of [the predecessor]." Id. at 76.

Whitecap contends that a genuine question of material fact exists as to whether the APA was a de facto merger or mere continuation of IMS Trading Corp. The names of the two companies are similar, Blachorsky became Trading LLC's president, many IMS Trading Corp. employees stayed on with Trading LLC, and Trading LLC remained at IMS Trading Corp.'s Wood Ridge facility for twenty months after the purchase. Furthermore, Central continues to manufacture the same product lines and sell those same products to many of the same customers.

In contrast, IMS Trading Corp. is now merely a shell that exists only to wrap up ongoing litigation. Thus, Whitecap argues, as in Woodrick, defendants planned to "absorb and continue" IMS Trading Corp.'s operations.

Defendants counter that IMS Trading Corp. still exists and shares no common ownership. They argue that IMS Trading Corp. is dissimilar and not a continuation of their current operation because Central's employees took over

<span>A-3461-19</span>

management of Trading LLC, Central incorporated Trading LLC into a single business unit with its other dog chew companies, only eighteen IMS Trading Corp. employees remained with Trading LLC as of 2019, defendants immediately began carrying out plans to build and move to a new facility, defendants informed customers of the change in ownership, and ultimately began changing Trading LLC's products and offerings.

IMS Trading Corp. did not continue to operate after selling its assets and did not compete with defendants in the dog chew business market. There simply is no evidence in this record that IMS Trading Corp. continued to engage in any day-to-day business activities—rather, it continued to exist only to resolve a lawsuit.

These facts and circumstances establish disputes that can only be decided at trial, not summary judgment. This record simply cannot confirm whether there was a de facto merger, a mere continuation, or a simple asset purchase.

III.

Whitecap asserts defendants underpaid commission fees and improperly terminated the business relationship. Clearly, beginning in October 2015, the parties disagreed about terms. Whitecap consistently objected to the two percent payments and demanded payment commensurate with the prior 2008 agreement.

14

Whitecap also appeals the court's finding that Trading LLC did not breach a contract when it terminated the relationship, insisting it never accepted the terms of defendants' October 2015 proposal.

In response, defendants contend that this issue was not raised to the trial court. However, it is subsumed in Whitecap's breach of contract argument and is simply a way of parsing out consideration of that question.

Whitecap further contends it is entitled to commissions on the continuing Delhaize sales because it was a requirements contract, and therefore all sales were ultimately attributable to Whitecap's efforts. With regard to Delhaize, Whitecap may be entitled to collect commissions pursuant to the 2008 agreement with IMS Trading Corp. Viewing the facts in the light most favorable to Whitecap, if a factfinder concluded the parties' ongoing business relationships were controlled by the 2008 agreement, then that factfinder could also conclude Whitecap was entitled to post-termination commissions for business it developed for defendants.

IV.

"Quantum meruit is a form of quasi-contractual recovery and 'rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another.'" Starkey v. Est. of Nicolaysen, 172 N.J. 60, 68 (2002)

(quoting Weichert Co. Realtors v. Ryan, 128 N.J. 427, 437 (1992)). "To recover under a theory of quantum meruit, a plaintiff must establish: '(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services.'" Ibid. (quoting Longo v. Shore & Reich, Ltd., 25 F.3d 94, 98 (2d Cir. 1994)).

Whitecap certainly knew defendants never thought Whitecap was entitled to anything more than two percent commissions. However, defendants continued working with Whitecap, despite knowing that Whitecap viewed itself as legally entitled to a higher rate of commission. Whitecap served defendants in good faith, and defendants accepted those services. The remaining question is whether the reasonable value of those services was higher or lower than two percent. A reasonable factfinder could conclude either way. Summary judgment should not have been granted on this point either.

Any arguments we have not addressed do not warrant discussion in a written opinion. See R. 2:11-3(e)(1)(E).

Reversed and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3461-19