KOCH MATERIALS COMPANY,
Plaintiff,

v.

SHORE SLURRY SEAL, INC., and
Asphalt Paving Systems, Inc.,
Defendants.

Shore Slurry Seal, Inc., Counterclaim
Plaintiff,

v.

Koch Materials Company,
Counterclaim
Defendant.

CIVIL ACTION NO. 01–2059.

United States District Court,
D. New Jersey.

June 12, 2002.

Stephen B. Nolan, Stradley, Ronon, Stevens & Young, LLP, Cherry Hill, NJ, John R. Ferguson, Jonathan P. Guy, L. Misha Preheim, Swidler Berlin Shereff Friedman, LLP, Washington, DC, Michael A. Ceramella, Wichita, KS, for Plaintiff and Counterclaim Defendant, Koch Materials Company.

Neil C. Schur, Stevens & Lee, P.C., Cherry Hill, NJ, Carl W. Hittinger, Donald E. Wieand, Jr., Stevens & Lee, P.C., Philadelphia, PA, for Defendant and Counterclaim Plaintiff, Shore Slurry Seal, Inc.

Frederic L. Shenkman, Howard E. Drucks, Cooper Perskie April Niedelman Wagenheim & Levenson, Atlantic City, NJ, for Defendant, Asphalt Paving Systems, Inc.

## OPINION

ORLOFSKY, District Judge.

## I. INTRODUCTION

A good relationship is built on good communication. As this case proves, that aphorism is no less true of long-term business dealings than it is of marriages. One of the Defendants, Shore Slurry Seal, Inc. ("Shore"), a construction company, entered into a long-term exclusive requirements contract with the Plaintiff, Koch Materials Company ("Koch"). Midway through the term of the contract, Shore informed the Plaintiff, in rather uncertain terms, that it planned to sell most or all of its assets to the second Defendant, Asphalt Paving Systems, Inc. ("Asphalt") which is now also in the construction business. Koch, through its attorney, sought assurances that any successor would be willing and able to continue the original deal. Apparently unhappy about dealing through attorneys, rather than as businessmen, Shore's re-

sponse was to refuse to give any meaningful information about the sale.

The law of contract, however, is designed to increase certainty in our dealings with one another. Otherwise, few reasonable businesses would be willing to invest in long-term cooperative agreements which, by virtue of the deal-specific investment, expose each party to significant risks of hold-up by the other. Thus, when one's contractual partner has reasonable grounds to fear that the contract will not be performed, one must answer those fears at the risk of giving the counterparty license to terminate the contract. Nor does the law, understandably, contemplate "I don't like lawyers" as an excuse for refusing to give such vital assurances.

Thus, for the reasons set forth here, and in more detail throughout the Opinion to follow, I must grant the Motion of the Plaintiff for Summary Judgment, authorizing Plaintiff to treat Shore's silence as a repudiation of the contract. I also grant much of the Plaintiff's Motion for Summary Judgment on the question of remedies, concluding that the contracts between the Plaintiff and Shore permit the Plaintiff to terminate and seek such damages as are authorized by the U.C.C. and the common law. With respect to Asphalt, Shore's putative successor, I find disputed questions of material fact related to the question whether or not Asphalt is, in fact, a successor, and therefore deny the Cross–Motions for Summary Judgment by both sides.

## II. FACTS AND PROCEDURAL HISTORY

Koch Materials Company, the Plaintiff in this case, is a manufacturer of asphalt and other road surfacing materials. In February of 1998, Koch bought from the Defendant, Shore Slurry Seal, Inc., an asphalt plant in New Jersey, as well as the domestic license rights to a specialty road surfacing substance, known as "Novachip." Koch's purchase price was five million dollars, payable in three installments. The last and smallest of these installments, in the amount of $500,000, is not due until 2004.

As part of the sale, Shore entered into two side contracts with Koch. First, Shore and Koch signed an Exclusive Supply Agreement, under which Shore agreed that for the seven years following the sale it would purchase all of its asphalt requirements from Koch, and in any event at least two million gallons of asphalt per year. The Agreement provided that, in the event Shore purchased less than six million gallons over the last three years of the contract, the $500,000 installment payment would be reduced by the same percentage by which Shore missed the six million gallon mark. Second, Shore promised to utilize at least 2.5 million square yards of Novachip annually, either in its own business or through sublicense agreements in certain permitted regions, and to pay royalties to Koch accordingly.

For the first three years of the contract, Shore met or exceeded its two million gallon minimum under the Exclusive Supply contract, but sold somewhat less than the 7.5 million square yards of Novachip the Sublicense Agreement called for. As the contracts provided, the parties adjusted the third-year installment payment to account for the shortfall.

On March 16, 2001, Robert Capoferri ("Capoferri"), the President and sole shareholder of Shore, sent a letter to Koch's general manager. The letter provided in relevant part that:

I have decided to retire from the road construction business....

The attorney for the buyer purchasing my assets has been in contact with our legal counsel, and they are close to hav-

ing drafts prepared for the proposed purchase agreement. In addition to the sale of all balance sheet assets, it is also intended that 100% of any and all existing Shore Slurry Seal, Inc. contracts will be assigned and/or sold to the prospective buyer.

Given that the Nova Chip Sublicense Agreement is not part of this proposed asset sale, Shore Slurry Seal, Inc. will continue to exist beyond the closing date in order to primarily collect and remit Nova Chip royalties on behalf of Koch Pavement Solutions.

Pl.'s R. 56.1 Statement Exh. E.[1] Capoferri sent a courtesy copy of the letter to his attorney.

Koch responded on April 3, 2001, with a letter from its attorney to the attorney for Shore. After referencing the Capoferri letter, Koch's missive stated:

> We have concerns about the sale because, during the next four years, Koch is owed a substantial amount of money from Shore under the February, 1998, Sale and Purchase Agreement, namely under the two schedules providing for exclusive supply and for Novachip royalties. In particular, we are concerned as to Shore's continued capacity to live up to its two million gallon per year commitment to buy asphalt emulsions and cutbacks and to meet its minimum square yardage requirements for Novachip.

> Mr. Capoferri's secrecy surrounding Shore's negotiations and the terms and conditions of sale are adding to our discomfort. We do not know the prospective purchaser, the closing date or what, if any, arrangements have been made to provide for an assignment of Shore's obligations to the new purchaser. Further, we have no indication that Shore is providing, or is willing to provide any type of security to satisfy its obligations to Koch. To date we know only that the sign in front of Shore's current offices has been changed to read "Asphalt Paving Systems" and that several company vehicles are now bearing this new moniker.

. . . . .

> Of course, once Shore has provided Koch with adequate assurance of performance of its obligations to Koch the process which we began with this letter can be terminated.

*Id.* Exh. F. Shore's answer, on April 6, 2001, was again a letter from Capoferri to Koch's general manager. Capoferri noted that he had conferred with his attorney, and went on to argue that:

> There has not been a failure to pay amounts due or to comply with requirements under any of the agreements we have with Koch. Nothing in any of the agreements drafted by Koch prohibit me from retiring business, nor do they require me to provide any type of security, collateral, or personal guarantee of payments similar to those we imposed upon our Nova Chip sublicensees.

> Regarding the assertion of secrecy contained in Mr. Hull's letter of April 3, 2001, I am not aware of provisions within our agreements requiring me to notify

---

1. I note that all three of the parties are in need of a refresher course on the Local Civil Rules of this Court. First, the parties seem to have forgotten that briefs, as well as statements drafted by attorneys, are not evidence. Thus, exhibits attached to briefs or statements are also not evidence. *See* L. Civ. R. 79.2; *Miller v. McMann,* 89 F.Supp.2d 564, 569 n. 4 (D.N.J.2000). Additionally, reply briefs (except briefs both replying to opposition and also opposing a cross-motion, *see* L. Civ. R.App. N(B.5)) may be no longer than 15 pages. L. Civ. R. 7.2(b). Shore's reply brief is more than 30 pages long.

Koch of any business negotiations that I may be involved in.

*Id.* Exh. G.

Finding little comfort in Shore's response, Koch filed a Complaint in this Court seeking recognition of their right to treat Shore's failure to give adequate assurances as a repudiation of the contract, pursuant to New Jersey's Uniform Commercial Code, N.J. Stat. Ann. § 12A:2–609(1) (1962), and the common law of contracts. Koch's Complaint also alleged breach of the Exclusive Supply and Novachip Sublicense Agreements due to Shore's bad faith. On October 30, 2001, Koch amended its Complaint to add as a party a possible successor of Shore, Asphalt Paving Systems, Inc. ("Asphalt"). Koch alleges that Asphalt is liable as Shore's successor, and, alternatively, if Asphalt is not a party to the contracts between Koch and Shore, that Asphalt tortiously interfered with those contracts.

Throughout the pendency of this dispute, Shore has continued to purchase asphalt and other products covered by the Exclusive Supply Agreement ("ESA") from Koch, and to remit royalties under the Sublicense Agreement.

Koch now seeks partial summary judgment on the liability aspects of its various claims, as well as on the question of what remedies are available to it under the contracts. Shore and Asphalt have both cross-moved for summary judgment on all of Koch's claims.[2]

As the parties are completely diverse, and the amount in controversy exceeds $75,000, exclusive of interest and costs, I have jurisdiction over Koch's claims pursuant to 28 U.S.C. § 1332. I have jurisdiction over Shore's Counterclaim pursuant to 28 U.S.C. § 1367(a).[3]

## III. DISCUSSION

### A. Summary Judgment Standard

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Abramson v. William Paterson Coll. of N.J.,* 260 F.3d 265, 276 (3d Cir.2001); *Doe v. County of Centre,* 242 F.3d 437, 446 (3d Cir.2001).

---

**2.** Shore has also filed a Counterclaim against Koch. I have already resolved Koch's Motion to Dismiss that Counterclaim, and Koch's Motion for Summary Judgment is pending. I do not address the Counterclaim in this Opinion.

**3.** Shore raises a largely meritless argument that Koch's claims either are not ripe, or fail to present a case or controversy. New Jersey's Uniform Commercial Code gives parties to a contract a judicially enforceable right to anticipate breach, and seek damages accordingly. See N.J. Stat. Ann. § 12A:2–609. That right accrues at the time provided in the statute—when the defendant fails to give adequate assurances. Id. § 609(4). As the comments to section 609 explain, the right to force repudiation reflects the fact that entities enter into contracts in order to plan for the future. A obligor who must prepare, or actu-

ally perform, in exchange for what he knows to be a fruitless exchange has opportunity costs, if nothing else, from the moment he begins preparing to carry out the deal. See N.J. Stat. Ann. 12A:2–609 U.C.C. Cmt. 1 ("[A] buyer who believes that the seller's deliveries have become uncertain cannot safely wait for the due date of performance when he has been buying to assure himself of materials for his current manufacturing or to replenish his stock of mechandise."). Certainly, at the point by which he reasonably seeks, and fails to receive, adequate assurances, he has suffered an "injury or threat of injury" that is "real and immediate, not conjectural or hypothetical." *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) (internal quotations omitted).

In deciding whether there is a disputed issue of material fact, the Court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. *See, e.g., Abramson,* 260 F.3d at 276 (citing *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 278 (3d Cir.2000)); *Shields v. Zuccarini,* 254 F.3d 476, 481 (3d Cir.2001)(citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

Under the rule, a movant must be awarded summary judgment on all properly supported issues identified in its motion, except those for which the non-moving party has provided admissible evidence or affidavits to show that a question of material fact remains. *See, e.g., Gleason v. Norwest Mortgage, Inc.,* 243 F.3d 130, 138 (3d Cir.2001)(citing *Becton Dickinson & Co. v. Wolckenhauer,* 215 F.3d 340, 343 (3d Cir.2000)). The non-moving party must provide "sufficient evidence to allow a factfinder to find in its favor at trial." *Id.* at 138.

**B. Koch's Claims Against Shore**

**1. Repudiation**

 When, in a contract for the sale of goods, one party has reasonable grounds to doubt that the other party will be able to perform, the doubting party may demand of its counterpart assurance that performance will occur. N.J. Stat. Ann. § 12A:2–609 (1).[4] If no adequate assurance is forthcoming within a commercially reasonable time, or in any event within 30 days, the doubting party may treat its counterparty as having repudiated the contract. *Id.* § 609(3), (4). A party need not wait for an actual material breach to demand assurances; it need only show that it

reasonably believed that such an event might be in the offing. *See Magnet Res., Inc. v. Summit MRI, Inc.,* 318 N.J.Super. 275, 289–90, 723 A.2d 976 (App.Div.1998) (citing *Carfield & Sons, Inc. v. Cowling,* 616 P.2d 1008, 1010 (Colo.Ct.App.1980)). "Any facts which should indicate to a reasonable merchant that the promised performance might not be forthcoming when due should be considered reasonable grounds for insecurity." *Diskmakers, Inc. v. DeWitt Equip. Corp.,* 555 F.2d 1177, 1179 (3d Cir.1977) (quoting N.J. Stat. Ann. 12A:2–609 N.J. Study cmt. 1). Assurances are adequate where they "would instill in a reasonable merchant a sense of reliance that the promised performance will be forthcoming when due." N.J. Stat. Ann. 12A:2–609 N.J. Study cmt. 1. New Jersey applies the same standards to contracts that are not for the sale of goods, as well. *See Magnet Resources,* 318 N.J.Super. at 290, 723 A.2d 976.

As an initial matter, I note that the parties have indulged in an extended debate about whether a variety of circumstances arising more than 30 days after April 3, 2001 provide either reasonable grounds for seeking assurances or adequate assurance. The question, however, is whether, at the time it sent the April 3, 2001 letter, Koch had a reasonable basis for doing so, and whether Shore adequately assured it within 30 days. I therefore fail to see why it is relevant (at least for liability purposes) whether, for example, Shore continued to buy product from Koch after May of 2001. *See By–Lo Oil Co., Inc. v. Partech, Inc.,* 2001 WL 630050, at *7 (6th Cir.2001) (unpublished) ("May of 1998 is of no consequence in evaluating whether By–Lo had reasonable grounds for insecurity in January of 1998 ....").[5]

----

4. Both Agreements are subject to a New Jersey choice-of-law clause. *See* Pl.s' R. 56.1

Statement Exh. A ¶ 24, Exh. B ¶ 19, Exh. C ¶ 11.

5. The case cited by Shore to the contrary,

■ Turning then, to the pertinent facts, I conclude that no reasonable fact-finder could fail to conclude that Koch had a commercially reasonable basis for demanding assurances on both the Exclusive Supply and Sublicense Agreements. The Sublicense Agreement analysis is straightforward. Shore reported that it planned to sell all of its "balance-sheet assets," but retain, rather than assign, the Sublicense Agreement. Even assuming that historically, Shore had met most of its Novachip obligations by selling sublicenses to third parties, rather than laying its own road surfacing, any reasonable person would wonder how Shore planned to sell *anything* with no telephones, no computers, and no office furniture. That Shore might well have leased these items only prompts further questions: Would Shore have had the financial capacity to obtain leases and hire a sales staff? Or were the proceeds of the sale going directly to Capoferri?

■ The Exclusive Supply Agreement is a bit more complex, but no less certain. In entering the ESA, Shore promised Koch not only a minimum annual purchase, but also all of the potential upside of Shore's requirements over and above the minimum should Shore's demand for asphalt grow over time. *See* Pl.'s L. Civ. R. 56.1 Statement Exh. B at 1. Thus, the identity of the purchaser, its future business plans, and its anticipated need for Koch's product could all affect significantly the amount of money that Koch would realize under the ESA, not only from the two million gallon minimum, but also from the potential upside. Capoferri's letter, it is true, promised that Shore's contracts, presumably including the ESA, would be assigned to the purchaser. Start-up construction businesses, however, begin un-

bonded, unable to win any bid for their first year and unable to secure sufficient bonding for large construction bids for several years. *See* Pl.'s Reply Br. Exh. 1 at 133; Shore's Br.App. Exh. 6 at 222–23. Koch had no way of knowing whether Asphalt was already a going business, and, if not, whether it would be able to win sufficient sub-contracting bids even to meet the minimum requirements, let alone approach the potential upside of an established enterprise like Shore.

Even aside from the particular facts of the construction industry, counterparty risk is an important feature of any requirements contract. Courts have often refused to permit assignment or delegation of duties under requirements or "best efforts" contracts where the assignment or delegation would be contrary to the justified expectations of the opposite contracting party. *See* E. Allan Farnsworth, *Contracts* 714–16, 745–47 & n. 38 (3d ed.1999). "[M]uch depends on the circumstances of the assignment: a court will react differently to an assignment to a similar operator . . . ." *Id.* at 716.

Indeed, the ESA protected Koch against the risk of assignment of contract rights to unknown third parties, by requiring Koch's "prior written consent" before assignment. Pl.'s R. 56.1 Statement Exh. B at ¶ 14 ("¶ 14"). At the time of the April 3 letter, Koch knew that some of Shore's offices and assets were now under the control of an unknown new party, Asphalt. Koch also knew that it had certainly never agreed to any assignment of the contract. Koch could reasonably have believed that a sale had already happened, either with no assignment of the ESA, or with an assignment in violation of the ESA's terms. Given the importance of the identity of the

*BAII Banking Corp. v. UPG, Inc.,* 985 F.2d 685, 703 (2d Cir.1993), in fact made only the common sense observation that, when a party has actually performed the contract, it is unreasonable to demand from him further assurances of performance.

counterparty to the contract, the possibility that ¶ 14 might have been in danger of breach would alone have been reasonable grounds at least to seek assurances otherwise.

Shore contends, however, and Koch does not dispute, that Koch knew when it entered into the two agreements that Capoferri was in poor health and intended to retire within three years. Shore's argument is that Koch should not be permitted to demand assurances for an event Koch should have anticipated. *Cf. By–Lo*, 2001 WL603050, at *5 ("The grounds that give rise to this feeling have to be something that occurred after the contract was in place."). Koch's contract, however, was with Shore, not Capoferri.[6] The contract between Koch and Shore expressly provided for a transfer of Shore's interests. *See* Pl.'s R. 56.1 Statement Exh. B ¶ 14. Whatever Capoferri's personal plans, Koch was entitled to assurances that its contractual partner, Shore, as well as any successors or assignees, would carry out the obligations of the Agreement.

█ Shore also argues that, regardless of whether Koch had reasonable grounds for doubt, the April 3, 2001 letter was insufficient, as a matter of law, to trigger any obligation on the part of Shore to respond. Koch's letter tracked closely the language of § 609,[7] and was sent from one attorney to another. In Shore's view, Koch should have not only quoted from the U.C.C., but also actually cited § 609. Yet courts have routinely accepted as sufficient under § 609 requests for assurances of a far less formal nature. *See, e.g., C.L.*

*Maddox, Inc. v. Coalfield Servs., Inc.*, 51 F.3d 76, 81 (7th Cir.1995) (holding that requests to sign a proposal "were in effect reasonable requests for assurances, or close enough to be treated the same by the law"); *Diskmakers*, 555 F.2d at 1180 (noting that seller's opportunity to inspect merchandise before accepting it could satisfy requirement of a written demand for reassurance); *Smyers v. Quartz Works Corp.*, 880 F.Supp. 1425, 1433 (D.Kan.1995) ("Under certain circumstances, even a demand for payment of earlier accounts due may be construed as a demand for adequate assurance under the Code.") (citing *Toppert v. Bunge Corp.*, 60 Ill.App.3d 607, 18 Ill.Dec. 171, 377 N.E.2d 324, 328 (1978)); *Magnet Resources*, 318 N.J.Super. at 283, 288–89, 723 A.2d 976 (treating declaration that service-provider intended to suspend service until payment was made as sufficient to constitute common-law demand for assurances). I also note that New Jersey's own U.C.C. Forms, while of course not official statements of the law, say only "I request from you satisfactory assurance that you will perform the obligations of the contract," without any citation to § 609. Samuel N. Reiken, 27 *N.J. Practice, Uniform Commercial Code Forms* § 2–210 Form 3 (2d ed.1995). I conclude, therefore, that Shore was required to give Koch adequate assurances that it would perform the contracts.

█ The remaining question, then, is whether it did so. Based on the summary judgment record, it appears that any reasonable fact-finder would determine that Shore did not. Far from assuring Koch

---

**6.** Shore's argument would be more persuasive if Capoferri had merely sold his stock in Shore to his employees. As his initial letter clearly indicated, however, he instead planned to maintain Shore while selling the *assets* and *contracts* of Shore to a new, unknown, unidentified corporation.

**7.** Koch's letter requested "adequate assurance of performance of [Shore's] obligations," Pl.'s R. 56.1 Statement Exh. F; Section 609 allows the seller to "demand adequate assurance of due performance." N.J. Stat. Ann. 12A:2–609(1).

that Shore would secure Koch's permission before assigning the ESA, Capoferri's April 6 letter asserted that "I am not aware of provisions within our agreements requiring me to notify Koch of any business negotiations that I may be involved in." Pl.'s L. Civ. R. 56.1 Statement Exh. G. This evasive answer not only failed to give Koch any information about the potential successor party to the contract, but also raised a new inference that Shore might be actively planning to *evade* the exclusive supply aspects of the ESA. It was, furthermore, close to a vow to breach ¶ 14 of the ESA. Nor did Shore give any indication about its ability to meet the Sublicense Agreement volume requirements.

I conclude, therefore, that Shore repudiated the ESA and Sublicense Agreement as of May 3, 2001.

## 2. Bad Faith Breach

█ Koch also asserts that, by selling its assets to Asphalt, Shore breached an implied requirement of good faith execution of the contract. The U.C.C. requires that parties to a requirements contract conduct themselves in good faith, *see* N.J. Stat. Ann. §§ 1–203, 2–306 (1962), and New Jersey contracts other than for the sale of goods also include an implied covenant of good faith and fair dealing. *See Sons of Thunder, Inc. v. Borden, Inc.*, 148 N.J. 396, 420, 690 A.2d 575 (1997). Good faith requires that the parties not act in such a way as to destroy or injure the rights of the other party to receive the fruits of the contract. *Id.* In a requirements contract, the obligation of good faith has been described as requiring that "a seller is entitled to expect that the buyer will buy something like the estimated requirements, unless it has a valid business reason for buying less." *Empire Gas Corp. v. Am. Bakeries Co.*, 840 F.2d 1333,

1340 (7th Cir.1988). Buying the contracted-for product from another supplier, however, is acting in bad faith. *See id.* at 1338–39.

The summary judgment record permits, but would not compel, a reasonable fact-finder to conclude that Shore acted in bad faith in selling its assets to Asphalt. Shore's sale of assets, in and of itself, would not necessarily be in bad faith. As I explain in more detail below, *see infra* Part III.C.1, however, the summary judgment record could support an inference that Shore structured the sale to Asphalt in order to permit future bids to utilize non-Koch sources of asphalt. As I have just noted, that would almost certainly exhibit bad faith on the part of a party to a requirements contract. The force of this inference, however, is undermined somewhat by the absence of any evidence in the summary judgment record that Shore's consumption of asphalt and Novachip has actually declined since the sale. It is difficult to say that Shore acted with the intention to reduce its purchases from Koch when Shore has not actually reduced its purchases. On the other hand, Koch does point to some evidence that Asphalt views itself as being under no obligation to utilize Koch products in its future bids. *See* Pl.'s R. 56.1 Statement Exh. J at 257–58. While marginally probative of the intent of Shore, that is hardly "smoking gun" evidence that would compel any reasonable fact-finder to find that Shore has acted in bad faith.

Accordingly, I will deny both Koch's Motion for Summary Judgment, and Shore's Cross–Motion for Summary Judgment, on the bad faith claim. In short, the question of bad faith presents genuine material issues of fact which cannot be resolved on the summary judgment record.

### 3. Remedies

█ Koch also seeks a determination that, should it decide to treat Shore's repudiation as a breach, and seek damages, it is not limited to reductions in the final installment payment. The ESA provides for reductions in the 2004 installment payment in the event Shore does not meet its minimum targets. *See* Pl.'s R. 56.1 Statement Exh. B ¶ 5. "Resort to a remedy as provided [in the contract] is optional unless the remedy is expressly agreed to be exclusive." N.J. Stat. Ann. § 12A:2–719(1)(b) (1962); *see also Chatlos Sys., Inc. v. Nat'l Cash Register Corp.*, 635 F.2d 1081, 1085 (3d Cir.1980).

Although the ESA does not by its own terms state that the installment reduction is Koch's exclusive remedy, Shore contends that such was the understood industry practice.[8] Established trade usage can fill gaps left by the text of a contract, apparently on the theory that both parties understood, or should reasonably have understood, that any agreement to do business in their field would include such a practice. *See* N.J. Stat. Ann. § 12A:1–205 (1962); *Posttape Assocs. v. Eastman Kodak Co.*, 537 F.2d 751, 756 (3d Cir.1976). Neither the U.C.C. nor the reported decisions on trade usage discuss at what point the longstanding good judgment of the trade members's attorneys in getting critical points of the contract down in writing can be converted to the uncertainties of a handshake understanding, other than that the usage must be "regular[ ]" and "reasonable." N.J. Stat. Ann. § 12A:1–25 U.C.C. Cmt. 5, 6.

There is almost no evidence in the summary judgment record either establishing or controverting the "regularity" of the trade usage shore alleges. Shore points only to Capoferri's affidavit, in which he states that "such limitations of remedies in requirements contracts are customary in the road construction and maintenance industry, particularly where jobs are publicly bid ...." Shore Br.App. Exh. 12. It is unclear just what degree of regularity I can infer from the term "customary," especially since Capoferri notes that there are some more specific circumstances, public bids, in which the custom is even more common. That implies that it is not a universal practice. Nonetheless, Koch has not provided any contrary evidence, and a reasonable finder of fact could perhaps conclude that a regular trade usage existed.

That leaves me to determine the exact scope of the remedy utilized by the trade. Shore asks me to infer from Capoferri's affidavit that trade usage can supply an unwritten exclusivity term limiting Koch's remedies for shortfalls in the minimum amount over the last three years of the contract to set-offs against the last installment payment. I am highly skeptical, however, that most or even many construction industry contracts involve a complicated structure of large cash payments from the seller to the buyer. Thus, while I believe it is a reasonable inference to find that trade usage may limit remedies to the value of the minimum requirement shortfall, it is unreasonable to further limit the ESA's remedies only to the amount of the last installment payment. In deciding a

---

**8.** I note that the ESA expressly provides that: "This Agreement ... shall contain the entire agreement of the parties, which agreement shall not be modified in any manner except by an instrument in writing executed by the parties .... No promise, representation, warranty, or covenant not included herein has been or is relied on by either party." Pl's R. 56.1 Statement Exh. B ¶ 18. The parties have not expressed an opinion as to whether this clause should have any effect on the "trade usage" claim, and therefore I decline to do so, as well.

motion for summary judgment, I need only draw all "reasonable" inferences in favor of the non-moving party. *See Abramson,* 260 F.3d at 276. Capoferri's affidavit also contends that trade usage was to permit only makeup payments, not an outright termination of the contract, in the event the buyer misses its contractual minimum. Although Capoferri refers several times to "requirements contracts," his affidavit describes a limited remedy only for "minimum volume" terms of such contracts. The affidavit makes no mention of remedies for lost upside over and above a minimum, nor for remedies in the event of breach of other, specialized terms—for example, the term in the ESA prohibiting Shore from assigning the ESA without Koch's permission. Since I have determined that these were material aspects of the ESA, Koch was entitled to terminate regardless of whether it could do so in response to Shore's failure to meet minimums.

Finally, the parties do not dispute that the Sublicense Agreement expressly preserved all available remedies. *See* Pl.'s R. 56.1 Statement Exh. C at 4. Shore argues, however, that the reservation is effective only to the extent that the set-off against the final installment payment is insufficient to make Koch whole and, as the set-off cannot be calculated until the end of the contact term, no other remedies are yet available. Koch, however, may choose to terminate the contract in response to Shore's repudiation. Regardless of when the original determination of the set-off was to occur, if Koch terminates, the contract is over. If Koch exercises that option, therefore, it may avail itself of any lawful remedy under the Sublicense Agreement.

In summary, then, Koch was entitled both to terminate the ESA and to seek payment for any shortfalls in the minimum purchase requirement. If it treats Shore's repudiation as a breach, Koch is also entitled to seek any lawful remedy under the Sublicense Agreement. I express no view at this time whether, in order to mitigate its damages as a result of a termination, Koch was required to continue to sell to Shore as much product as Shore was willing to purchase.

### C. Koch's Claims Against Asphalt

Koch's Amended Complaint alleges that Asphalt, by purchasing most of Shore's assets and frustrating Shore's ability to perform its contracts with Koch, tortiously interfered with both the ESA and Sublicense Agreement. Koch also alleges that Asphalt is a successor to, or alter ego of, Shore, and therefore jointly liable for its debts. Koch has moved for summary judgment on the tortious interference claim, and Asphalt has cross-moved on both the tortious interference and successor/alter ego allegations. I will deny both motions.

#### 1. Tortious Interference

A tortious interference plaintiff must show malice, that is, intentional and wrongful interference by a non-party with a contractual relationship, *see Printing Mart–Morristown v. Sharp Electronics Corp.,* 116 N.J. 739, 750, 563 A.2d 31 (1989), and that a reasonably anticipated economic benefit was lost as a result, *see Lamorte Burns & Co. v. Walters,* 167 N.J. 285, 305–06, 770 A.2d 1158 (2001). This rather neat formula, however, belies a murky balancing that ultimately determines whether a given interference with contract is tortious. *See* Restatement (Second) of Torts § 767 (1979) (listing seven vague factors for court or jury to consider in determining wrongfulness).

A reasonable fact-finder could, but would not necessarily, determine that

Koch has made out the basic elements of tortious interference: that is, that Asphalt was not a party to the contract; that it acted intentionally or knowingly, *see* Restatement (Second) of Torts § 766 cmt. j; and that there was a causal relation between Asphalt's acts and Koch's loss of reasonably anticipated economic benefits arising from the ESA and Sublicense Agreement. Asphalt's principal was the general manager of Shore, and likely knew of the existence of the two contracts. When Asphalt purchased Shore's assets, it assumed some other contracts, but not the ESA or the Sublicense Agreement. Moreover, Asphalt apparently directed Shore not to disclose that Asphalt was the purchaser of Shore's assets. A reasonable fact-finder could conclude, from this evidence, that Asphalt structured its purchase in order to avoid the constraints of the ESA and Sublicense Agreement. The problem with this scenario is that there is no evidence in the summary judgment to show that, to date, Shore's actual consumption of product under the ESA and Sublicense Agreement has fallen off from levels projected before the sale. In addition to making the scenario somewhat doubtful, that fact also makes it more difficult, although not impossible, for Koch to establish causation—for example, Koch might claim that Asphalt's influence helped to cause Shore's repudiation, which in turn resulted in harm to Koch's economic interests.

Asphalt could also reasonably have known that, as a result of its arrangements with Shore, Shore would be unable to fulfill Koch's expectation that Koch would realize not only the minimum sales volume, but also the potential upside of the ESA and Sublicense Agreement. For example, one plausible story one could tell, based on the summary judgment record, is that Shore hoped to cobble together enough work, either through subcontracting to Asphalt or through work not covered by its non-compete agreement with Asphalt, to barely make its minimums, while allowing Asphalt (once bonded) to bid on new projects unconstrained by the ESA. A reasonable fact-finder could infer that both Asphalt and Shore desired such an arrangement, and even that the purchase price for Shore's assets and "good faith" reflected a premium paid for Asphalt's freedom from the Koch contracts.

Alternately, one could say simply that, by insisting on secrecy in the sales agreement, Asphalt induced Shore to breach ¶ 14 of the ESA. Again, in that scenario, Koch's damage story at this point would have to be that Shore's repudiation was caused by Asphalt's demand for secrecy, perhaps motivated in part by a desire to gain freedom from the ESA. That is a permissible, but by no means necessary, inference from the summary judgment record.

Finally, in my view, it is possible that at trial Koch would be able to establish that Asphalt's actions under one of the scenarios I described was "wrongful." The Restatement notes, for example, that in some circumstances, when party A makes its deal with B contingent on B's refusal to deal with C, A may be liable for tortious interference.[9] *See* Restatement (Second) of Torts § 766 cmt. l. The critical factor,

---

9. Somewhat confusingly, New Jersey has both embraced the Restatement approach for malice, *see Printing Mart–Morristown,* 116 N.J. at 752, 563 A.2d 31, and also described malice as action "inflicted intentionally and without justification or excuse." *See DiMaria Constr., Inc. v. Interarch,* 2001 WL 1887900, —— A.2d

—— (N.J.Super.App.Div.2001), *aff'd,* 172 N.J. 182, 797 A.2d 137 (2002). One supposes that the two standards are reconcilable if we read "without justification or excuse" as meaning without "reasonable" or "reasonable business" justification or excuse.

apparently, is whether A "uses his own refusal to deal or the threat of it as a means of affirmative inducement." *Id.* A reasonable fact-finder might conclude, on this record, that Asphalt would not have purchased Shore's assets if it also had to inherit the ESA. He or she might also conclude, based on Shore's recalcitrance in disclosing the terms of the sale, that Asphalt had made that condition clear to Shore, and that Shore acted aggressively in order to protect that condition of its sale to Asphalt.

I conclude, therefore, that I must deny both Koch's Motion and Asphalt's Cross-motion for Summary Judgment on the tortious interference claim.

## 2. Successor/Alter–Ego Liability

■ Although a purchaser is generally not liable for the debts of the company from whom it purchases assets, *see Lefever v. K.P. Hovnanian Enters.,* 160 N.J. 307, 310, 734 A.2d 290 (1999), the purchaser is, in fact, liable when it is a "mere continuation of the seller." *Id.* New Jersey, in defining what is a "mere continuation," looks to four factors: "(i) continuity of management, personnel, physical location, assets, and general business operations; (ii) a cessation of ordinary business and dissolution of the predecessor as soon as practically and legally possible; (iii) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor; and (iv) continuity of ownership/shareholders." *Woodrick v. Jack J. Burke Real Estate,* 306 N.J.Super. 61, 73–74, 703 A.2d 306 (App.Div.1997). While no one factor is dispositive, the intent of the contracting parties is especially important. *See id.* at 74, 76–77, 703 A.2d 306; *Luxliner P.L. Export Co. v. RDI/Luxliner, Inc.,* 13 F.3d 69, 73 (3d Cir.1993).

■ Asphalt, relying on *McKee v. Harris–Seybold Co.,* 109 N.J.Super. 555, 264 A.2d 98 (Law Div.1970), argues that since Shore itself continued in business, Asphalt can hardly be seen as a "mere continuation" of Shore. New Jersey, however, has since repudiated *McKee,* and adopted a broader standard of successor liability de-emphasizing "continuity of shareholder interest." *Woodrick,* 306 N.J.Super. at 74–77, 703 A.2d 306. Asphalt's position, moreover, makes little sense in the context of modern business, where a corporation might easily sell an entire division and carry on dutifully in another area. The reasonable business expectations of those who relied upon the spun-off division are no less worthy of continued protection, nor is the risk of intentional evasion of pre-existing contractual and tort obligations lower, simply because the original stockholders were wise enough to have diverse interests.

Furthermore, Asphalt does not dispute that nearly all of Shore's employees are now employed by Asphalt. There is no serious question that Asphalt operates much of the same machinery, is obligated under several of the same contracts related to that machinery, carries out the same public contracts, and utilizes the same office space, as Shore once did. The structure of the sale suggests that the intent of the parties was to continue Shore's business, and to keep Shore's employees working at the trade they knew regardless of Capoferri's quasi-retirement. On these facts, a reasonable finder of fact could conclude that Asphalt is Shore's successor. Accordingly, I must deny Asphalt's Motion for Summary Judgment on the question of successor liability.

■ In contrast, in response to Asphalt's Motion for Summary Judgment on the alter-ego issue, Koch does not point to any evidence demonstrating that Asphalt

"is a mere instrument of a parent corporation so dominated that it has no separate existence." *Karo Marketing Corp. v. Playdrome Am.*, 331 N.J.Super. 430, 442–43, 752 A.2d 341 (App.Div.2000) (quoting *State Dep't of Envtl. Prot. v. Ventron Corp.*, 94 N.J. 473, 500–01, 468 A.2d 150 (1983)). That showing ordinarily requires that the party seeking to "pierce the corporate veil" demonstrate that the dominated company is grossly undercapitalized, that it has not observed corporate formalities, that it is insolvent at the time of suit, that it has intermingled funds with the other person or entity, that there are no corporate records, or that it is clear that the corporation is " 'merely a facade for the operations of the dominant stockholder or stockholders.' " *See Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145, 150–51 & n. 3 (3d Cir.1988) (quoting *Am. Bell Inc. v. Fed'n of Tel. Workers*, 736 F.2d 879, 886 (3d Cir.1984)). Koch's showing meets, at best, only the very last of these various factors. Accordingly, I must grant Asphalt's Motion for Summary Judgment on the corporate veil/alter-ego issue.

## IV. CONCLUSION

For the reasons set forth above, I will grant Koch's Motion for Summary Judgment on the repudiation question, and grant it in part on the question of liability, as described in more detail supra. I will deny Koch's Motion in all other respects. I will deny Shore's Cross–Motion for Summary Judgment in its entirety. Finally, I will grant Asphalt's Cross–Motion for Summary Judgment on the corporate veil/alter-ego issue, but deny the remainder of its Motion. The Court will enter an appropriate form of Order.

## ORDER

This matter having come before the Court on the Motion of Plaintiff and Counterclaim Defendant, Koch Materials Company, for Partial Summary Judgment, pursuant to Fed.R.Civ.P. 56, and on the Cross–Motions for Summary Judgment of Defendants, Shore Slurry Seal, Inc. and Asphalt Paving Systems, Inc., Stephen B. Nolan, Esq., Stradley, Ronon, Stevens & Young, LLP, John R. Ferguson, Esq., Jonathan P. Guy, Esq., L. Misha Preheim, Esq., Swidler Berlin Shereff Friedman, LLP, Michael A. Ceramella, Esq., Koch Industries, appearing on behalf of Plaintiff and Counterclaim Defendant, Koch Materials Company, and Neil C. Schur, Esq., Carl W. Hittinger, Esq., Donald E. Wieand, Jr., Esq. Stevens & Lee, P.C., appearing on behalf of Defendant and Counterclaim Plaintiff, Shore Slurry Seal, Inc., and Frederic L. Shenkman, Esq., Howard E. Drucks, Esq., Cooper Perskie April Niedelman Wagenheim & Levenson, appearing on behalf of Defendant, Asphalt Paving Systems, Inc.; and,

The Court having considered the papers submitted by counsel for Plaintiff in support of and in opposition to the motions and the papers submitted by counsel for Defendants in opposition and support; and,

For the reasons stated in the Opinion filed concurrently with this Order, IT IS, on this 12th day of June, 2002, hereby ORDERED that:

1. The Motion of Plaintiff and Counterclaim Defendant, Koch Materials Company, for Partial Summary Judgment, is GRANTED IN PART and DENIED IN PART; and,

2. The Cross–Motion of Defendant and Counterclaim Plaintiff, Shore Slurry Seal, Inc., for Summary Judgment, is DENIED; and,

3. The Cross–Motion of Defendant, Asphalt Paving Systems, Inc., is GRANTED IN PART and DENIED IN PART; and,

4. The Motion of Plaintiff and Counterclaim Defendant, Koch Materials Company, for Partial Summary Judgment, is GRANTED on the question of whether the Defendant and Counterclaim Plaintiff, Shore Slurry Seal, Inc., repudiated the contracts between the two parties; and,

5. The Motion of Plaintiff and Counterclaim Defendant, Koch Materials Company, for Partial Summary Judgment, is GRANTED IN PART on the question of remedies available under the contracts; specifically, Plaintiff may terminate the Exclusive Supply Agreement between the parties, and, if Plaintiff elects to treat the Defendant's repudiation as a breach, Plaintiff may seek any lawful remedy for breach of the Sublicense Agreement and for breach of the Exclusive Supply Agreement other than those relating to minimum volume, however, Plaintiff's remedy for breach of the minimum volume provision of the Exclusive Supply Agreement is limited to payment for any shortfalls in the minimum purchase requirement under that contract; and,

6. The Motion of Plaintiff and Counterclaim Defendant, Koch Materials Company, for Partial Summary Judgment, is DENIED in all other respects; and,

7. The Cross–Motion of Defendant, Asphalt Paving Systems, Inc., is GRANTED as to the claim of the Plaintiff and Counterclaim Defendant, Koch Materials Company, that Asphalt is an alter-ego of the Defendant and Counter–Claim Plaintiff, Shore Slurry Seal, Inc.; and,

8. The Cross–Motion of Defendant, Asphalt Paving Systems, Inc., is DENIED in all other respects.